IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

AT NASHVILLE

SEPTEMBER 1998 SESSION

FILED

April 22, 1999

Cecil W. Crowson
Appellate Court Clerk

| | | |
|---|---|---|
| STATE OF TENNESSEE, | * | C.C.A. # 01C01-9710-CC-00467 |
| Appellee, | * | DICKSON COUNTY |
| VS. | * | Hon. Robert E. Burch, Judge |
| JEFFERY L. PERRY, | * | (Second Degree Murder) |
| Appellant. | * | |

For Appellant:

Shipp R. Weems
District Public Defender

Carey J. Thompson
and
Mitch Dugan
Assistant Public Defenders
P.O. Box 160
Charlotte, TN 37036

For Appellee:

John Knox Walkup
Attorney General & Reporter

Daryl J. Brand
Senior Counsel
Criminal Justice Division
425 Fifth Avenue North
Nashville, TN 37243

Robert S. Wilson
Assistant District Attorney General
Court Square, P.O. Box 580
Charlotte, TN 37036

OPINION FILED: _____

AFFIRMED

GARY R. WADE, PRESIDING JUDGE

## OPINION

The defendant, Jeffery L. Perry, was convicted in the second degree murder of his father, Leon Perry. The trial court sentenced the defendant, who qualified as a violent offender, to fifteen years imprisonment in a special needs facility. In this appeal of right, the defendant presents the following issues for review:

> (I) whether the evidence is sufficient to support the conviction for second degree murder;
>
> (II) whether the trial court erred by denying the defendant's motion to suppress his custodial statement; and
>
> (III) whether Tenn. Code Ann. § 39-11-501, the statute governing the affirmative defense of insanity, is unconstitutional.

We affirm the judgment of the trial court.

Late in the evening of November 5, 1995, Donald Shirley of the Dickson County Sheriff's Department was dispatched to the Perry residence to investigate a shooting. Upon his arrival at the residence, Deputy Shirley surveyed the front yard while Sergeant Steve Lovell went to the rear of the house. When he heard Sergeant Lovell order the defendant to put his hands in the air, Deputy Shirley ran to the side of the residence and informed the sergeant that the defendant was deaf. Upon entering the residence, Deputy Shirley located the body of the victim, Leon Perry, on the living room floor.

Sergeant Steve Lovell testified that he made hand gestures to direct the defendant, who was in his truck, to unlock the truck and step outside the vehicle. Sergeant Lovell, who described the defendant as being under the influence of glue, noticed several empty glue containers, a case of glue, and the strong odor of glue in

2

the truck. He recalled that the defendant appeared to be surprised and "tensed up" several times while he was being handcuffed. After being placed in a patrol car, the defendant kicked out the side window and propelled himself through the broken glass onto the driveway.

Deputy Sheriff Robert Hayes, who assisted in the arrest, described the defendant as uncooperative, but otherwise calm and expressionless. He recalled that the smell of glue in the truck was very strong and he observed a box on the floorboard that contained tubes of glue. He testified that there were five or six opened packages of glue on the seat of the truck and a space heater was in the floorboard.

Martha Kay Perry, the defendant's mother, testified that on the day of the shooting the defendant had spent the afternoon sniffing glue in his truck. At about 9:35 P.M., she heard the defendant enter the house and go to his bedroom. The victim, the defendant's father, was in the living room. She testified that she then heard a gunshot and heard the victim say something like, "[p]lease don't shoot me, Jeff." When a second shot was fired, Ms. Perry grabbed a can of mace and ran into the hallway where the defendant stood with a shotgun. Ms. Perry sprayed the defendant with mace, and, after a struggle, she was able to break free. When she saw the victim lying on the living room floor, she grabbed the cordless telephone, called 9-1-1, and fled in her vehicle.

Ms. Perry testified that the defendant had suffered nerve deafness at the age of two. She stated that from the age of five until he graduated from high school, the defendant attended the Tennessee School for the Deaf in Knoxville. She recalled that her son was popular and excelled as a student and athlete. He

3

received his high school diploma in 1982. Ms. Perry testified that the defendant could read fairly well but not as well as a hearing person. After high school, the defendant returned to Dickson to live with his parents and worked at their service station as a mechanic for the next four years. Although he had performed well at his job, he had experienced difficulty making friends in Dickson and had become very self-conscious about being deaf.

In 1985, after the defendant sustained a head injury in an auto accident and refused medical treatment, Ms. Perry noticed behavioral changes in the defendant. She described him as "paranoid" and recalled him say, "Everybody's watching me, looking at me ... They're laughing at me." She testified that he was easily agitated and that his behavior deteriorated until eventually the Perrys had asked him to stop working at the service station. She recalled that over the next year, the defendant routinely paced the floor for hours at a time while yelling and making animal sounds.

In 1987, the Perrys took the defendant to Middle Tennessee Mental Health Institute and then to the Parthenon Pavilion where he remained for several weeks. He was diagnosed as a paranoid schizophrenic. During the following year, the defendant stopped taking his prescribed medication, became "real violent," and required sedation. Two days after an incident requiring sedation, the defendant attacked a bank teller and was readmitted to the Middle Tennessee Mental Health Institute. He was then transferred to Horizon Hospital in Clearwater, Florida, where the hospital staff was trained in American Sign Language. The defendant, who remained at Horizon Hospital for approximately five months, was again diagnosed as a paranoid schizophrenic. During his stay there, the defendant ingested thumbtacks, rocks, and toothpicks, ultimately requiring emergency surgery.

4

After the defendant was returned to his home, he required quarterly evaluations at Southridge, a psychological hospital in Dickson. He experienced few problems until 1995, when the defendant became more frequently agitated even though he consistently received his prescribed medications. At that point, Ms. Perry learned that the defendant was sniffing glue. He stayed away from home on most nights and returned in an intoxicated condition but not smelling of alcohol. She described the defendant as even more agitated and more violent during this period. He also stopped communicating with his parents. Ms. Perry testified that she had learned some American Sign Language but that the victim knew very little.

Ms. Perry recalled that the defendant would sit in his truck behind her residence and sniff glue throughout the night. When she tried to convince him to stop, the defendant replied, "It stops the electricity in my head." Ms. Perry testified that the defendant claimed to hear voices that directed him to do things. She realized that the defendant's glue consumption continued to increase over time.

By October of 1995, Ms. Perry had become increasingly fearful of the defendant. When he acted violently toward her and the victim, she returned him to Parthenon Pavilion for treatment of the glue addiction. During his last hospitalization before the shooting, a physician at Parthenon Pavilion changed the defendant's medication and released him six days later despite the Perrys' objections. Although the defendant was scheduled to attend a drug rehabilitation program in Memphis especially designed for the hearing impaired, the facility would not allow admission until a neurologist examined a cyst that had been discovered on his brain. Ms. Perry explained that she did not want the defendant at her home because "he wasn't well enough ...." The appointment with the neurologist was scheduled for the day after the shooting.

5

During the week that followed his release from Parthenon Pavilion, the defendant resumed the abuse of glue. Ms. Perry recalled that on the "Friday we brought him home ... after he got his clothes unpacked ... [he] bought glue and started sniffing it." At trial, she testified that she was certain that the defendant understood that he was to be admitted to a drug treatment center. She believed that he was willing to go. Ms. Perry recalled that on the day of the shooting, the victim had asked the defendant to try to stop sniffing glue.

Detective Randy Starkey of the Dickson County Sheriff's Department investigated the crime scene at 11:30 P.M. He collected a spent shotgun shell in the living room, another in the hallway, and a third in the defendant's bedroom. He found a .12-gauge single-shot shotgun on the defendant's bed. The gun was empty but had the odor of recently burned gun powder. Detective Starkey explained that to load a single-shot shotgun, the weapon had to be broken down, a shell inserted, and the gun closed. He stated that after the gun is fired, it must be broken down to eject the spent shell and before another live shell can be inserted.

After the shooting, officers found a box of .12-gauge live shotgun shells in the defendant's bedroom, the same type as the spent shells collected from the living room, hallway, and bedroom. A can of mace was located near the back door of the house near a woman's bedroom shoe. Detective Starkey found a plastic bag containing model glue and eight empty tubes of glue in the defendant's truck.

At 2:30 A.M., about four hours after the defendant's arrest, Detective Starkey and Detective Butts interrogated the defendant at the station house. Detective Butts read the defendant an admonition and waiver of rights and allowed the defendant to read the form. According to the detectives, the defendant indicated

that he understood his rights, signed the form, and did not ask for a lawyer.

Detective Butts then wrote questions on one piece of paper and the defendant wrote

answers on another, as follows:

Det. Butts: My name is Detective Craig Butts[.] Next to me is Capt. Randy Starkey. Would you read this form stating your Miranda rights? Do you understand your rights[?]

Defendant: Yes.

Det. Butts: Will you write out a statement as to what happened?

Defendant: I killed my dad for reason I get angry.

Det. Butts: Will you write it on this form and tell us what happened at the house. Why did you get angry[?]

Defendant: I killed my dad for reason I get angry.

Det. Butts: Why[?]

Defendant: I lost my control.

Det. Butts: What did you do to him (your father)[?]

Defendant: Because I don't like him.

Det. Butts: Did you shoot him[?]

Defendant: Yes.

Det. Butts: With what and how many times[?]

Defendant: 3 bullet.

Det. Butts: Shotgun or Rifle[?]

Defendant: Rifle.

Det. Butts: .12 ga. -.20 ga. or .410[?]

Defendant: 12 gauge.

Det. Butts: What did your father do tonight to make you angry[?]

Defendant: He watched TV. He keep watch me.

Det. Butts: Did you try to hurt your mother[?]

7

Defendant:   No.

Det. Butts:   If you shot 3 times, where did the three shots go[?]

Defendant:   I shot him at couch.

Det. Butts:   Do you know where the 3 shots hit your father[?]

Defendant:   3 times.

Det. Butts:   Where[?]

Defendant:   [underlined couch]

Det. Butts:   Did you shoot the couch first or your father[?]

Defendant:   I started to shoot him.

Det. Butts:   Did you ever plan to kill your father[?]

Defendant:   [N]o, first time.

Det. Butts:   What were you doing before you shot your father[?]

Defendant:   I took glue.

Det. Butts:   What did you do with the glue and how[?]

Defendant:   I sniff get glue with bags.

Det. Butts:   How much glue did you sniff before going into the house[?]

Defendant:   About 5 or 8.

Det. Butts:   Tubes if so, please write it behind the 8.

Defendant:   (circled five) I get sniff glue then I stop it.

Det. Butts:   Are you alright[?]

Defendant:   Yes.

Det. Butts:   Do you need a doctor[?]

Defendant:   Yes.

Det. Butts:   For what[?]

Defendant:   Stop glue.

8

The defendant signed the statement. Detective Starkey recalled that the defendant was calm and appeared alert and cooperative during the interview.

On cross-examination, Detective Starkey acknowledged that there were no signs of a struggle at the Perry residence. He agreed that the defendant had not attempted to conceal the weapon, shells, or other evidence of the crime and recalled that the defendant was restrained in the back seat of the patrol car during the collection and preservation of evidence. Detective Starkey, who did not know whether the defendant was given anything to drink or provided an opportunity to use the restroom, was aware that the defendant had been using glue and was aware that he was deaf. He acknowledged that he considered trying to find a sign language interpreter to assist in interviewing the defendant but, because of the late hour and fees involved, he elected to proceed without an interpreter.

Dr. Donna L. Seger is Assistant Professor of Medicine at Vanderbilt University Medical Center and Medical Director of the Middle Tennessee Poison Control Center. Her specialty is toxicology and she primarily treats individuals who have been exposed to inhalants. Through deposition, Dr. Seger testified that she examined the defendant's medical records from 1987 until January 1996. Based upon the content of the records, Dr. Seger agreed that the defendant suffered from paranoid schizophrenia. She determined that the defendant had a history of chronic drug dependence, including cocaine and alcohol use and sniffing model airplane glue.

Dr. Seger testified that model airplane glue contains solvents and adhesives which, when inhaled, have significant effects upon the nervous system. It was her opinion that the ingredients affect a person's ability to think, decrease

9

intelligence, cause personality changes, anxiety, depression and, when used chronically, "result in paranoid thinking." Dr. Seger testified that one who had sniffed glue as long as the defendant had would necessarily suffer permanent and irreversible brain damage. She also concluded that one who sniffed five to eight tubes of glue would exhibit depression, anxiety, paranoia, an inability to remember, an inability to concentrate, personality changes, decreased intelligence, and increased fatigue. It was her opinion that the effects of glue would be more extreme in one affected with paranoid schizophrenia. She stated that glue inhalation affects a deaf person's ability to understand what was being communicated, whether written or verbal.

Dr. Seger was uncertain, however, whether the defendant, who had apparently sniffed several tubes of glue before shooting his father, could have appreciated the wrongfulness of his actions at that time. She agreed that if the defendant had not been taking his medications as prescribed, the effect of glue on his nervous system, in combination with the presence of paranoid schizophrenia, would have been profound. Dr. Seger explained that most glue sniffers show no physical manifestations, the primary reason the practice is so popular. It is well documented, however, that chronic use results in long term damage to the central nervous system. Dr. Seger concluded that if someone had sniffed five tubes of glue, that person could appear calm and attentive, because "a lot of sniffing makes you feel very tired and just like sitting."

Dr. Gillian Blair, a licensed clinical psychologist certified to determine competency for trial in this state, met with the defendant on three occasions in May, July, and September of 1996 for total of twelve to fourteen hours. She administered psychological examinations with the assistance of Dr. Laurel Goodrich, a

10

psychologist who specializes in counseling deaf persons. Dr. Blair also interviewed the defendant's mother and reviewed all the defendant's medical and psychiatric records. She discovered that there was a history of "significant mental illness" in their family. One uncle committed suicide several years ago for unknown reasons and another uncle had been diagnosed a schizophrenic. She reported that every hospital which had treated the defendant had determined that the defendant was a paranoid schizophrenic with the possible exception of Middle Tennessee Mental Health Institute, which had not made a conclusive diagnosis. Dr. Blair's independent diagnosis of the defendant was paranoid schizophrenia coupled with a substance abuse disorder.

Dr. Blair testified that schizophrenia is a psychotic thought disorder and the symptoms must be present for more than six months before a diagnosis can be made. She stated that the defendant presents primarily negative symptoms which include flat affect,[1] an inability to engage in goal directed behavior, a poverty of speech, dysfunctional personal relationships, and paranoia, which is a "suspicious feeling ... that people are talking about you or that people are against you." A paranoid type schizophrenic does not exhibit disorganized behavior or an inappropriate affect. Dr. Blair testified that the defendant described the chronic experience of hallucinations. It was her view that for a number of years, he had been "unable to engage in goal directed behavior." She stated that the defendant also has a poverty of speech, which appears frequently in schizophrenics but also could result from his deafness. Dr. Blair concluded that the defendant had experienced command hallucinations, which consist of voices that tell him to do

---

[1]Affect is defined as "[a] pattern of observable behaviors that is the expression of a subjectively experienced feeling state (emotion). Common examples of affect are sadness, elation, and anger." A flat affect is a disturbance in affect in which there is an "absence or near absence of any signs of affective expression." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (DSM-IV) 763 (4th ed. 1994).

11

something, and other symptoms of paranoid schizophrenia "long before" he began sniffing glue. She testified that the defendant had informed her that the voices told him to shoot his father. She believed that he had ingested rocks and thumbtacks in 1988 while at Horizon Hospital as a result of similar command hallucinations.

Dr. Blair testified that the defendant was in Parthenon Pavilion from October 21 to October 27, 1995, and while he was there the psychiatrist changed his medication. Dr. Blair testified that she thought his discharge from the hospital was premature. At that time, his global assessment of functioning was valued at thirty,[2] which indicated serious impairment in communications or judgment. His discharge notes indicated, "[b]ehavior is considerably influenced by delusions or hallucinations, or there is serious impairment of judgment and/or inability to function in almost all areas."

Through an interpreter the defendant communicated to Dr. Blair that he took glue as a way of diminishing the hallucinations that he experienced. She stated that the act of sniffing glue was volitional but that the desire of the defendant to rid himself of the hallucinations may have been so strong as to overcome the voluntariness of the act. Dr. Blair testified that the defendant suffered from a severe mental disease or defect, namely, schizophrenia. Based upon all of the information available to her, she concluded that the defendant was unable to appreciate the wrongfulness of his behavior the night of the shooting. Dr. Blair, who had performed hundreds of forensic evaluations and had testified in over one hundred trials, stated

_____

[2]The Global Assessment of Functioning Scale (GAS) is a hypothetical continuum of mental health illness that considers psychological, social and occupational levels of functioning in a patient. The score of 21 to 30 indicates that the patient's behavior is "considerably influenced by delusions or hallucinations or serious impairment in communication or judgment or an inability to function in almost all areas ...." In comparison, a score of 91 to 100 indicates superior functioning in a broad range of activities and a score of 41 to 50 reflects serious symptoms such as suicidal ideation or serious impairment in functioning. A score between 1 and 10 warns that the patient presents persistent danger to himself or others or is persistently unable to maintain minimal personal hygiene or commits serious suicidal acts with a clear expectation of death. DSM-IV at 32.

that she had found evidence supporting an insanity defense in only four cases, including this one.

On cross-examination, Dr. Blair acknowledged that while the defendant has schizophrenia, he was nonetheless competent to stand trial. Dr. Blair stated that the defendant had loved his father but that it was possible that he felt resentment because his father had difficulty accepting his son's impairments and failed to learn sign language so as to improve their level of communication. Dr. Blair conceded the possibility that the defendant had shot his father out of anger, as his statement indicated.

Dr. Blair also acknowledged that Dr. Farooque at Middle Tennessee Mental Health Institute had diagnosed the defendant in December 1987 as having an adjustment disorder with depressed mood. She was also aware that one month later, Dr. Farooque had diagnosed the defendant as having schizophreniform disorder, which is a precursor to schizophrenia. In March 1998, before his discharge to Horizon Hospital in Florida, Dr. Farooque deferred making a diagnosis of the defendant on the basis of insufficient information.

Dr. Robert A. Brimmer, a psychiatrist board certified in psychiatry and forensics, presented rebuttal proof for the state. After reviewing all of the defendant's medical records, including the summary by Dr. Blair, Dr. Brimmer observed the defendant, interviewed him with the assistance of an interpreter, and provided him with a form questionnaire. Based on the two-hour examination, Dr. Brimmer concluded that the defendant had command hallucinations and had "[s]chizophrenia by history." He considered the possibility that the defendant had been misdiagnosed and might suffer from a character disorder, "not otherwise

13

specified with antisocial and passive-aggressive features."  As for the defendant's substance abuse, Dr. Brimmer agreed that glue sniffing mimics the symptoms of schizophrenia and concluded that glue sniffing would increase his paranoia.  He also determined that the defendant could "read, write and communicate in a rational manner."  He testified that the defendant did not suffer from a mental disease or defect but rather had a character disorder and that he was able to discern right from wrong.  As an example of the defendant's ability to appreciate the nature of his acts, Dr. Brimmer testified that he had asked the defendant, "[if you] went to a store and wanted something but didn't have the money to pay for it, would you take it? And [the defendant] told me, 'No.'"  In Dr. Brimmer's opinion, the act of loading, shooting, and reloading the shotgun indicated that the defendant understood the nature of his acts.

On cross-examination, Dr. Brimmer testified that his usual procedure in diagnosing schizophrenia is to listen carefully to the speech of the patient for "word salad," putting odd words together.  He conceded that the procedure was not helpful in assessing the defendant.  He recognized that a flat affect could be a symptom of the disease or a learned behavior and that someone who sat motionless and expressionless could be schizophrenic.  In reviewing the historical diagnoses made by other doctors, Dr. Brimmer conceded that most had diagnosed paranoid schizophrenia.  He also pointed out that Dr. Farooque at Middle Tennessee Mental Health Institute had initially diagnosed schizophreniform, which serves as an early diagnosis of schizophrenia, and later deferred on making a diagnosis.  Dr. Brimmer explained that if substance abuse were present, a diagnosis of schizophreniform could be incorrect, but he conceded there was no evidence in the medical records to indicate that the defendant abused alcohol, cocaine or inhalants in 1987 or 1988, when Dr. Farooque made the diagnosis of

14

schizophreniform.

It was stipulated that the .12 gauge shingle-shot shotgun was a gift to the defendant from his grandfather. The defendant had owned the shotgun for several years. The cause of the victim's death was hemorrhage from a gunshot wound.

I

The defendant challenges the sufficiency of the evidence. He contends that he proved the affirmative defense of insanity by clear and convincing evidence and that the jury ignored the weight of the evidence. He contends that the jury should have found that the defendant's diminished capacity prevented him from forming a knowing mens rea.

On appeal, of course, the state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which might be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). The credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters entrusted to the jury as trier of fact. Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978). When the sufficiency of the evidence is challenged, the relevant question is whether, after reviewing the evidence in the light most favorable to the state, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983); Tenn. R. App. P. 13(e).

Second degree murder is defined as a "knowing killing of another." Tenn. Code Ann. § 39-13-210(a)(1). Knowing is a culpable mental state that is

15

defined as follows:

> "Knowing" refers to a person who acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result.

Tenn. Code Ann. § 39-11-302(b).

Regarding the defense of insanity which was amended in 1995, our Code provides as follows:

> (a) It is an affirmative defense to prosecution that, at the time of the commission of the acts constituting the offense, the defendant, as a result of a severe mental disease or defect, was unable to appreciate the nature or wrongfulness of such defendant's acts. Mental disease or defect does not otherwise constitute a defense. The defendant has the burden of proving the defense of insanity by clear and convincing evidence.
>
> (b) As used in this section, "mental disease or defect" does not include any abnormality manifested only by repeated criminal or otherwise antisocial conduct.
>
> (c) No expert witness may testify as to whether the defendant was or was not insane as set forth in subsection (a). Such ultimate issue is a matter for the trier of fact alone.

Tenn. Code Ann. § 39-11-501.

The defense of diminished capacity, while not codified, has been recognized by our supreme court. In State v. Hall, 958 S.W.2d 679 (Tenn. 1997), the court observed that "'diminished capacity' is actually a defendant's presentation of expert, psychiatric evidence aimed at negating the requisite culpable mental state." Id. at 688; see Tenn. Code Ann. § 39-11-201(a)(2). While diminished capacity is not an excuse or justification for committing the offense, it contemplates an acquittal of the indicted offense and a conviction for a lesser included offense.

16

Hall, 958 S.W.2d at 688.

This court may not reweigh or reevaluate the evidence. The jury rejected claims of insanity and diminished capacity, determining that the defendant was fully capable of forming the mens rea necessary to commit a knowing killing. Because there was evidence to support their determination, we must defer to the results reached by the finders of fact.

The evidence viewed in a light most favorable to the state is sufficient to support a conviction for second degree murder. It is uncontested that the defendant entered the residence, went into his bedroom, armed himself, and approached the victim who was lying on the couch in the living room. The proof established that the defendant fired his shotgun at the couch, broke down the weapon, discharged the spent shell, and reloaded the weapon. While the victim pleaded for his life, the defendant shot him in the shoulder.

Although the defendant presented proof to support insanity and diminished capacity, the jury accredited the expert witness for the state who determined that the defendant had a character disorder rather than a mental disease or defect and that he was able to appreciate the nature of his conduct at the time of the shooting. In the light most favorable to the state, a rational trier of fact could have concluded that the defendant was aware of his conduct and the likely results of his conduct. Jackson v. Virginia, 443 U.S. 307 (1979).

II

Next, the defendant argues that the trial court erred by failing to suppress two separate custodial statements. He claims that the officer failed to

17

advise him of his constitutional rights before the first statement and that the warnings provided before the second statement were not effectively communicated because the defendant had no sign language interpreter, suffered from a mental disease, and was under the influence of glue. The state argues that any error surrounding the first statement is harmless because the statement was not placed in evidence during trial. While the state concedes that the defendant did not have the benefit of a sign language interpreter, the state argues that he nonetheless had read, understood, and voluntarily waived his rights so as to allow introduction of the second statement.

The first written statement, taken by Detective Starkey at 2:30 A.M., was as follows:

| | |
|---|---|
| Det. Starkey: | Do you know why you are here? |
| Defendant: | Yes. I killed my dad. |
| Det. Starkey: | Jeff, can you sign your name? |
| Defendant: | Sure. |
| Det. Starkey: | Will you? |

Detective Starkey had not provided the defendant with any warnings before taking the statement.

Detective Randy Starkey, who testified that the defendant was in custody within twenty minutes of the 9-1-1 call and did not have access to any intoxicants for over four hours, from 10:16 P.M. until 2:30 A.M., when he was interrogated. He described the defendant as calm during the interview. Although he had never interviewed a deaf person, Detective Starkey testified that he believed the defendant could read lips. The detective explained that he put the questions in writing so that he would have a record of the full interview.

Craig Butts, formerly an officer with the Dickson Police Department,

had questioned the defendant moments after Detective Starkey. Officer Butts directed the defendant to read the waiver of rights form and then asked in writing whether he understood his rights. The defendant responded affirmatively. Officer Butts testified that the defendant had appeared "[r]elatively calm" and attentive while making his statement. He determined that the statement of the defendant included a fairly accurate description of the physical proof found at the scene.

The defendant, through an interpreter, testified at the suppression hearing that he recalled being questioned by Officer Butts and Detective Starkey on the evening of his arrest and that he remembered signing the waiver of rights form. He claimed that, due to the glue he had inhaled, he did not understand some of his rights. When asked if it was easier for him to communicate with someone using American Sign Language or through the written word, he responded: "Written ... Well, both." He acknowledged that he read lips "[a] little bit."

At the suppression hearing, the defendant read and translated the written Miranda warnings as follows:

| | |
|---|---|
| Warning: | Do you understand that you have a right to an attorney before you're questioned by the police? |
| Defendant: | Before going to talk and then going to court. |
| Warning: | Do you understand that you do not have to talk to the police without an attorney being present? |
| Defendant: | I don't understand. |
| Warning: | Do you understand that you could stop the questioning by police at any time until you have an attorney present? |
| Defendant: | I don't understand. |
| Warning: | You have the right to remain silent. |
| Defendant: | I will talk with a lawyer. |
| Warning: | Anything you say can be used against you in court. |

Defendant: What I want, to talk with a lawyer, just whatever.

Warning: If you cannot afford to hire a lawyer, one will be appointed to represent you before any questioning if you wish one.

Defendant: If I can't afford a lawyer, then I will not talk with a lawyer. And then if I can afford a lawyer, then I will talk to a lawyer.

Warning: If you decide to answer any questions now, without a lawyer present, you will have the right to stop answering at any time. You also have the right to stop answering at any time until you talk to a lawyer.

Defendant: I can't decide to talk to a lawyer until a lawyer's gotten, then we can talk.

On cross-examination, the defendant testified that he had received instruction in American Sign Language in school for fourteen years. He stated that he understood the written word and American Sign Language "the same." He conceded that he was somewhat familiar with the court system but maintained that he did not fully understand his rights because he was under the influence of glue and the words were blurry. He stated that he would have understood his rights as he read them if he had not taken any glue. The defendant maintained that he could write clearly and on the line because he took his time and the influence of glue had begun to wear off at that point. He admitted that he never asked for a lawyer.

Dr. Gillian Blair summarized the defendant's social and medical history and presented her diagnosis of schizophrenia, paranoid type, with substance dependence, all of which was similar to her testimony later at trial. Dr. Blair also explained that at Middle Tennessee Mental Health Institute, an examining psychologist Dr. Sheila Peters had found that the defendant was untestable and "question[ed] whether he could adequately understand the written word." Dr. Blair stated that the defendant was "significantly impaired by virtue of the solvents that he

20

had been inhaling" and she again pointed to his diagnosis of paranoid schizophrenia. Dr. Blair, who reviewed the defendant's second statement to police, testified that she had "grave concerns" about the defendant's condition when the statement was given, some four hours after the shooting. The defendant told her that he had felt very confused at the time. Dr. Blair also had "grave concerns about his ability to understand written statements." Dr. Blair testified that while she was testing the defendant, he had experienced difficulty understanding the meaning of words, which had surprised her because he is a high school graduate who can read and write. She had learned from the interpreter that assisted in the interview that "in the [American Sign Language] translation, the meaning can be very concrete, and the abstract meaning [of a word] is not always apparent."

On cross-examination, Dr. Blair conceded that the questions put to the defendant by Detective Butts were not complicated, that the defendant had average intelligence, and in her report she had noted that he "reads well." She also acknowledged that the defendant's statement was consistent with the physical evidence found at the Perry residence. Dr. Blair recognized that the defendant had some familiarity with the court system.

Yvonne Fuhrer, an interpreter with the League for the Hearing Impaired, has been using American Sign Language all of her life and is certified as a sign-language interpreter. She testified that while English is a written and spoken language, American Sign Language is a conceptual language that is "dependent upon vision to have the context of an idea." American Sign Language is actually a foreign language in the United States: "It has its own grammatical order and syntax ... completely separate from the English language." Ms. Fuhrer testified that while most English speaking people learn the language from listening, the deaf, who do

21

not have the benefit of incidental learning, do not "pick up" phrases or hear the different contexts in which words can be used. Thus, Ms. Fuhrer concluded that the defendant, after having read the Miranda warnings, would not understand them as would a hearing person.

Ms. Fuhrer testified that most deaf people read on a third or fourth grade level and, although the defendant had graduated from high school, that fact did not convince her that he would have understood the Miranda rights as he read them. Ms. Fuhrer stated that only a small percentage of the deaf can read lips because it requires special training and many hours of study. She described lip reading as only thirty-five percent accurate. Ms. Fuhrer testified that she interpreted the Miranda warnings to the defendant at the arraignment and he had replied immediately that he wanted an attorney. Ms. Fuhrer said, given her experience with the deaf, that there was a substantial possibility that the defendant did not understand the written Miranda warnings.

In denying the defendant's motion to suppress, the trial court concluded as follows:

> [The defendant] is more intelligent than the normal person that we deal with. Now, he has communication difficulties, but intelligence is not the problem.
> I make that observation to point out the level of understanding of the rights of a defendant is very low for admissibility, because if it were any higher, many of the citizens charged with crimes ... simply would never understand their rights.
> [I]f the accused has sufficient understanding to comprehend the obligation of an oath and is capable of giving a correct account of the matters of which he has knowledge, he's competent to be a witness. ... [C]ompetency of a witness and competency to confess [equate with each other].
> Therefore, if the accused comprehends that he need not talk, that he could have a lawyer, that the statements can be used against him. And if his confession did not involve official coercion, then he can

22

make a valid waiver of his rights.

I understand the dangers inherent to taking statements and so forth from persons who are deaf. ... The question is: Was the way it was done sufficient under the law? And the Court rules that it is.

I have read [the defendant's statement]. ... [T]he questions were written out for [the defendant], he read them, and then he wrote out the answers. ... And it is coherent question and answer.

Obviously, in whatever state [the defendant] was in that night, he was able to comprehend questions and give intelligent answers. The Court is of the opinion that he was simply capable of understanding these Miranda rights and did understand these Miranda rights at the time that they were shown to him and he read them.

Our scope of review is limited. The findings of fact made by the trial judge at a hearing on a motion to suppress "will be upheld unless the evidence preponderates otherwise." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). Questions about witness credibility and "resolution of conflicts in the evidence are matters entrusted to the trial judge." Id. Testimony presented at trial may be considered by an appellate court in deciding the propriety of the trial court's ruling on a motion to suppress. State v. Henning, 975 S.W.2d 290 (Tenn. 1998). If the "greater weight" of the evidence supports the court's ruling, it will be upheld. Id. Yet, this court must conduct a de novo review of the trial court's application of law to fact. State v. Bridges, 963 S.W.2d 487 (Tenn. 1997); State v. Yeargan, 958 S.W.2d 626 (Tenn. 1997).

The trial court made no ruling on the admissibility of the first, unwarned statement. Generally, Miranda warnings must precede a custodial interrogation. Berkemer v. McCarty, 468 U.S. 420 (1984). The test to be applied to determine if an individual is in custody is whether a "reasonable [person] in the suspect's position" would have believed himself or herself to be "in custody." Id., 468 U.S. at 442; see generally State v. Cooper, 912 S.W.2d 756 (1995).

In State v. Anderson, 937 S.W.2d 851, 855 (Tenn. 1996), our supreme court held that whether a person is "in custody" depends on the totality of the circumstances. Factors which may be considered include time, duration, location and character of the interview, the tone and demeanor of the questioning officer, the manner in which the suspect was transported to the location of questioning, the number of law enforcement officials present, limitations or restraints placed on the suspect's movement, interaction between the suspect and the questioning officer, confrontation by officers with evidence of guilt, and the whether the suspect is informed that he or she may refuse to answer questions and may end the questioning at any time. Id. Here, the defendant's hands and feet were bound. He had been restrained in a patrol car for several hours before being transported to the police station where, still wearing handcuffs, he was interviewed by two officers. He was not free to leave. From all of this, we must conclude that the defendant provided both of the incriminating statements while "in custody"; thus, proper Miranda warnings were required. As no warnings were provided before the initial statement was elicited, that statement should have been suppressed by the trial court. Any error in failing to suppress the statement was certainly not prejudicial, however, because the unwarned statement was not admitted at trial. Moreover, the defendant does not argue that the first, unwarned confession tainted the second, warned confession. See State v. Smith, 834 S.W.2d 915 (Tenn. 1992).

A warned confession must meet constitutional safeguards. Miranda v. Arizona, 384 U.S. 436 (1966). This court must examine the "totality of the circumstances" to ascertain whether the particular defendant knowingly and voluntarily waived his constitutional rights prior to making a confession. State v. Bush, 942 S.W.2d 489, 500 (Tenn. 1997). "The relinquishment of the right must be voluntary in the sense that it is the product of a free and deliberate choice rather

24

than the product of intimidation, coercion[,] or deception.  Moreover, the waiver must be made with full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it."  State v. Stephenson, 878 S.W.2d 530, 544-45 (Tenn. 1994) (citing Fare v. Michael C., 442 U.S. 707 (1979); North Carolina v. Butler, 441 U.S. 369, 374-75 (1979)).  Factors relevant in determining whether a confession is voluntary include (1) the length of time between the arrest and the confession; (2) the occurrence of intervening events between the arrest and confession; (3) the giving of Miranda warnings; and (4) the purpose and flagrancy of the official misconduct.  Brown v. Illinois, 422 U.S. 590, 603-04 (1975); State v. Chandler, 547 S.W.2d 918, 920 (Tenn. 1977).  The overriding question, however, is whether the behavior of law enforcement officials served to overbear the defendant's will to resist.  State v. Kelly, 603 S.W.2d 726, 728 (Tenn. 1980); see State v. Howard, 617 S.W.2d 656, 658-59 (Tenn. Crim. App. 1981).   With the exception of the initial unwarned confession, there is no evidence of official misconduct in this record.  The defendant was interviewed within hours of his arrest with no remarkable events intervening.  He appeared coherent and calm and never asked for an attorney.  He had some familiarity with the court system.  Detective Butts read the waiver of rights form to the defendant and asked the defendant to read it to himself.  The defendant read it and indicated that he understood his rights.

The defendant argues that he could not have understood his rights or voluntarily or knowingly waived his rights because he suffers from paranoid schizophrenia, was under the influence of glue, and did not have a sign language interpreter.  Yet a statement  provided by a suspect who is under the influence of drugs is admissible so long as the statement is coherent.  State v. Green, 613 S.W.2d 229, 232-33 (Tenn. Crim. App. 1980).  Mental unsoundness will not render a confession invalid, so long as the evidence demonstrates that the suspect was

25

capable of understanding and waiving his rights. State v. Bell, 690 S.W.2d 879, 882 (Tenn. Crim. App. 1985). "Language difficulties encountered by a defendant are considered in determining if there has been a valid waiver." State v. Van Tran, 864 S.W.2d 465, 473 (Tenn. 1993).

The circumstances involved in this case are troublesome. This deaf defendant has presented proof of mental illness and intoxication. In addition, the Miranda warnings were administered without the benefit of a sign language interpreter. These factors must be considered when reviewing the trial court's conclusion that the waiver of rights was knowing and voluntary.

Dr. Blair testified that paranoid schizophrenia affected the defendant's ability to reason and comprehend. Dr. Seger testified that chronic glue sniffing over a long period of time exacerbated paranoia in the defendant and interfered with the effectiveness of his medications. Nonetheless, the defense experts, who voiced "grave concerns" about his ability to comprehend his rights, were unable to say that the defendant had not, in fact, understood his rights. While there was some indication that the defendant had some difficulty reading the Miranda warnings and explaining their meaning, the trial court concluded that the defendant's mental illness did not affect his ability to understand his rights or voluntarily waive them.

Apparently, the defendant had sniffed glue throughout the day and evening up to the time of the shooting. Arresting officers recalled that the defendant was under the influence of glue when arrested and that the odor of glue emanating from the defendant's truck was "strong." Empty tubes of glue and a plastic bag of glue were recovered from the truck. The defendant maintained that had it not been for the glue, he would have been able to read and understand the Miranda rights.

26

He also testified, however, that the effect of the glue was "going away" at about 2:30 A.M., when he read the waiver of rights form. His answers were generally responsive and coherent despite the possibility that, according to Dr. Seger, the defendant's chronic use of glue may have reduced his cognitive abilities. The trial court determined that the defendant possessed above-average intelligence and was able to comprehend questions and provide intelligent answers.

The defendant also argues that he did not fully understand his Miranda warnings because he had no sign language interpreter. He concedes that he can read, write, and read lips to some extent. He testified that he understands the written word and sign language "the same." The trial judge, who heard all the testimony, ruled that the defendant was capable of understanding and in fact did understand his Miranda rights. In consequence, we find that the greater weight of the evidence supports the trial court's conclusions that the defendant's waiver was knowing and voluntary and that he was not so intoxicated nor mentally unsound as to render the confession inadmissible.[3]

III

By challenging the constitutionality of portions of the statute governing

---

[3]Our legislature has enacted laws that are particularly protective of deaf suspects. Tennessee Code Annotated, section 24-1-103(b)(3) mandates a qualified interpreter for a deaf suspect prior to custodial interrogation:

> In the event a person who is deaf is arrested and taken into custody for any alleged violation of a criminal law of this state, the arresting officers and the arresting officer's superiors shall procure a qualified interpreter in order to properly interrogate such deaf person and to interpret such person's statements. No statement taken from such deaf person before an interpreter is present may be admissible in court.

At trial, the defendant did not claim protection under this statute. Moreover, the application of the statute to these circumstances was neither asserted as a ground for a new trial nor argued as a basis for relief in the appellate brief. Failure on the part of the defendant to raise an issue on his motion for new trial requires waiver. State v. Durham, 614 S.W.2d 815 (Tenn. Crim. App. 1981). Issues are waived when not briefed. Tenn. R. App. P. 27(a)(7); Tenn. Ct. Crim. App. R. 10.

the defense of insanity, the defendant presents issues of first impression. See

Tenn. Code Ann. § 39-11-501. The defendant argues that subpart (a), which

requires the defendant to prove insanity by clear and convincing proof,

unconstitutionally shifts the burden of proof to the defendant. He maintains that

subpart (c), which prohibits an expert witness from testifying that the defendant was

or was not insane, unconstitutionally limits his ability to present a defense.

Ultimately, the defendant complains of a denial of due process. The state's

response is twofold: first, the United States Supreme Court has found constitutional

similar statutes placing the burden of proof on the defendant; and second, the

defendant lacks standing to challenge subpart (c) or, if the defendant has standing,

limiting expert testimony on the ultimate issue passes constitutional muster.


When this issue was argued at the pretrial hearing, the trial court ruled

that the statute was constitutional, as follows:

> With regard to Section (a) ... I believe there are two or
> three U.S. Supreme Court cases that have ruled that
> shifting the burden of proving insanity to the defendant
> does not violate the United States Constitution. I am not
> aware of any difference in our Tennessee Constitution of
> 1870 that would require a different ruling. ... Insanity was
> not a defense prior to M['[Na[]ghten. And it was created
> by the House of Lords in the case and has been, I think,
> abolished in some states. So it's not a Constitutional
> right one way or the other. Therefore, the Court does not
> find Section (a) to be unconstitutional.
> ***
> You gentlemen know what it is to prove a
> circumstantial case. It means that you can't ask one
> question. It does not mean that you cannot ask sixteen
> questions and get the same results in front of the jury.
> Simply, circumstantially prove, by questions asked the
> witness, "Was he able to do this? Was he able to
> comprehend that?" and so forth, to convince the jury of
> this final question of whether the defendant could
> appreciate the nature or wrongfulness of his act. It can't
> be done in one question, but it can be done in several.
> It does not prohibit this defense. It does not
> prohibit expert testimony of this defense. It just makes it
> harder.
> Therefore, the Court rules that Section (c),

28

> likewise, is constitutional, and the motion is respectfully denied.

At the motion for new trial, the trial court ruled as the thirteenth juror that the defendant had proved insanity only by a preponderance of the evidence and not by clear and convincing evidence.

> Until 1995, the statutory definition for insanity was as follows:
>
> Insanity.--(a) Insanity is a defense to prosecution if, at the time of such conduct, as a result of mental disease or defect, the person lacked substantial capacity either to appreciate the wrongfulness of the person's conduct or to conform that conduct to the requirements of law.
>
> (b) As used in this section, "mental disease or defect" does not include any abnormality manifested only by repeated criminal or otherwise antisocial conduct.

Tenn. Code Ann. § 39-11-501 (Repealed 1995). Moreover, until 1995, expert witnesses could testify to an ultimate issue, including that of the defendant's mental responsibility. Tenn. R. Evid. 704. In 1995, our legislature amended the insanity statute in its entirety, as follows:

> (a) It is an affirmative defense to prosecution that, at the time of the commission of the acts constituting the offense, the defendant, as a result of a severe mental disease or defect, was unable to appreciate the nature or wrongfulness of such defendant's acts. Mental disease or defect does not otherwise constitute a defense. The defendant has the burden of proving the defense of insanity by clear and convincing evidence.
>
> (b) As used in this section, "mental disease or defect" does not include any abnormality manifested only by repeated criminal or otherwise antisocial conduct.
>
> (c) No expert witness may testify as to whether the defendant was or was not insane as set forth in subsection (a). Such ultimate issue is a matter for the trier of fact alone.

Tenn. Code Ann. § 39-11-501 (emphasis added). Although Rule 704, Tenn. R. Evid., was not amended to preclude expert testimony on the ultimate issue of insanity, the 1996 Advisory Commission Comments recognize that such testimony

29

has been restricted under Tenn. Code Ann. § 39-11-501. It is well established that a specific provision relating to a particular subject controls and takes precedence over a general provision applicable to a multitude of subjects. State v. Black, 897 S.W.2d 680, 683 (Tenn. 1995).

The United States Supreme Court has ruled that a state may require a defendant to prove the defense of insanity beyond a reasonable doubt without resulting in a denial of due process under the federal constitution. Leland v. Oregon, 343 U.S. 790 (1952). "It is axiomatic, therefore, that a lesser standard of proof, such as the clear and convincing standard, may be imposed." United States v. Amos, 803 F.2d 419, 421 (8th Cir. 1986). See also United States v. Freeman, 804 F.2d 1574 (11th Cir. 1986). In Freeman, the defendant challenged the burden of proving insanity by clear and convincing evidence under the Insanity Defense Reform Act of 1984. The Circuit Court held that the rule announced in Leland compelled a determination that the clear and convincing evidence standard was constitutional. 804 F.2d at 1576. The Insanity Defense Reform Act of 1984 is similar to the statute challenged by the defendant.[4]

The defendant cites no authority that would require a different result under the constitution of our state. Instead, he argues that the ruling in Leland is called into question by the Supreme Court's more recent holding Cooper v. Oklahoma, 517 U.S. 348, 116 S. Ct. 1373 (1996). We disagree. Cooper holds that a defendant may not be required to prove incompetency to stand trial under the

---

[4](a) Affirmative defense.---It is an affirmative defense to the prosecution under any Federal statute that, at the time of the commission of the acts constituting the offense, the defendant, as a result of a severe mental disease or defect, was unable to appreciate the nature and quality or the wrongfulness of his acts. Mental disease or defect does not otherwise constitute a defense.

(b) Burden of proof.---The defendant has the burden of proving the defense of insanity by clear and convincing proof.

18 U.S.C. § 17.

clear and convincing standard because to do so is "incompatible with the dictates of due process." Cooper, 116 S. Ct. at 1384. The Court reasoned that historic and modern practice as well as the fundamental interest at stake required a preponderance of the evidence standard rather than one of clear and convincing evidence for competency determinations. Cooper, 116 S. Ct. at 1377.

Here, the defendant contends that requiring him to prove insanity by clear and convincing evidence "violates a fundamental principle of justice when ... the defendant showed that more likely than not he was insane at the time of the crime." We disagree. The Court in Cooper distinguished the nature of the interest involved in proving incompetency from the burden of proof and procedural burdens required to prove insanity. See id., 116 S. Ct. at 1383 (citing Patterson v. New York, 432 U.S. 197 (1977)). While the former warrants constitutional protection because it is a fundamental and deeply rooted interest, the latter is simply legislatively established. Id. We must, therefore, reject the defendant's contention that Cooper requires a different result and, under Leland, we uphold the constitutionality of subpart (a) requiring the defendant to prove insanity by clear and convincing evidence.

Next, the defendant challenges subpart (c) of the statute. In response, the state contends that the defendant has no standing to challenge the statute and that a similar federal rule limiting expert testimony on the ultimate issue has been declared constitutional. "[A] person has no standing to contest the constitutionality of a statutory provision unless the provision[] he claims to be deficient has been used to deprive him of his rights." State v. Purkey, 689 S.W.2d 196, 201 (Tenn. Crim. App. 1984); State v. Vanzant, 659 S.W.2d 816 (Tenn. Crim. App. 1983); State v. Pritchett, 621 S.W.2d 127 (Tenn. 1981). Although Dr. Blair ultimately determined

31

that this was a case in which the evidence supported an insanity defense, she was not permitted to testify that the defendant was "insane" at the time of the offense. In our assessment, the defendant has standing.

In his argument that Tenn. Code Ann. § 39-11-501(c) unconstitutionally restricts the defense from presenting evidence to disprove the mental element of the offense, the defendant relies upon State v. Phipps, 883 S.W.2d 138 (Tenn. 1994). In Phipps, this court held that a defendant has a constitutional right to present evidence regarding his state of mind at the time of the offense. 883 S.W.2d at 148-49. The evidence must be relevant to a mental disease or defect and demonstrate a lack of capacity to form the required mental state. State v. Hall, 958 S.W.2d 679, 689-90 (Tenn. 1997). While this court recognizes that the defendant has a constitutional right to present evidence to negate an element of the offense, the presentation of evidence is also subject to reasonable limitation by the trial court. Phipps, 883 S.W.2d at 149 (citing U.S. Const. Amend. V, VI, XIV; Tenn. Code Ann. § 39-11-201(a)); State v. Hutchison, 898 S.W.2d 161, 172 (Tenn. 1994).

Initially, federal circuit courts have upheld the constitutionality of the Rule 704(b), Federal Rules of Evidence, which restricts expert testimony as to the ultimate issue of insanity. The Eleventh Circuit determined that the rule applied equally to the state and defense and did not prevent the defendant from presenting evidence. Freeman, 804 F.2d at 1576; accord United States v. Blumberg, 961 F.2d 787, 789-90 (8th Cir. 1992). In Blumberg, the Eighth Circuit held that Rule 704(b), Fed. R. Evid., does not offend due process or equal protection because the rule does not exclude evidence and because the right to present witnesses, although fundamental, is also limited: "Congress amended Rule 704(b) 'to eliminate the

confusing spectacle of competing expert witnesses [giving] directly contradictory conclusions [about] the ultimate legal issue to be found by the trier of fact.'" Id. at 790 (quoting S.Rep. No. 225, 98th Cong., Ist. Sess. 230, reprinted in 1984 U.S.C.C.A.N. 3182, 3412) (alterations in original).

Second, this court must construe subpart (c) narrowly because of the interests at stake. Although subpart (c) precludes an expert from testifying that the defendant was, in fact, legally "insane" at the time of the commission of the offense, the expert may testify that the defendant suffered from a severe mental disease or defect. The expert may also state whether the defendant could have appreciated the nature or wrongfulness of his conduct at the time of the offense. Subpart (c), however, does prevent the expert from stating that the severe mental disease or defect operated to prevent the defendant from appreciating the nature or wrongfulness of his conduct. In that regard, the jury must render the ultimate determination as to the effect of mental disease on the defendant's understanding of his conduct at the time of the offense.

In summary, the clear and convincing standard does not deprive the defendant of due process. Moreover, the provision prohibiting expert testimony on the ultimate issue of insanity does not deny the defendant his right to present a defense.

Accordingly, the judgment of the trial court is affirmed.

_____
Gary R. Wade, Presiding Judge

CONCUR:

_____
John H. Peay, Judge


_____
James Curwood Witt, Jr., Judge