IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs October 15, 2013 at Knoxville

**STATE OF TENNESSEE v. HANK WISE**

**Appeal from the Criminal Court for Davidson County**
**No. 2009-C-2653      Seth Norman, Judge**

**No. M2012-02520-CCA-R3-CD - Filed March 13, 2014**

The Defendant, Hank Wise, was indicted on one count of premeditated first degree murder for the death of the victim, Benjamin Goeser. See Tenn. Code Ann. § 39-13-202. Following a bench trial, the Defendant was convicted of the lesser-included offense of second degree murder. See Tenn. Code Ann. § 39-13-210. The trial court subsequently sentenced the Defendant to twenty-three years for the offense. In this appeal as of right, the Defendant contends (1) that the trial court erred by failing to find him not guilty by reason of insanity; and (2) that the trial court erred by imposing an excessive sentence. Following our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN and JEFFREY S. BIVINS, JJ., joined.

Dawn Deaner, District Public Defender; Jeffrey A. DeVasher (on appeal), Laura C. Dykes (at trial), and James P. McNamara (at trial), Assistant Public Defenders, for the appellant, Hank Wise.

Robert E. Cooper, Jr., Attorney General and Reporter; Clark B. Thornton, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Dan Hamm, Roger D. Moore, and Dina Shabayek, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

FACTUAL BACKGROUND

*I. Evidence Regarding the Offense*

*A. The Killing of the Victim*

On the evening of April 2, 2009, the Defendant went to the Buck Wild Saloon in Nashville. Jules Hanson testified at trial that she was a waitress at the Buck Wild Saloon and recognized the Defendant as "a regular at the bar." According to Ms. Hanson, the Defendant would usually sign up to sing karaoke and "set in for the long haul," but on that night, he did not. Instead, the Defendant ordered a beer and talked to a "couple of people from the downtown karaoke circuit." After speaking to them, the Defendant asked Ms. Hanson for directions to Jonny's Sports Bar (Jonny's) and then left. Ms. Hanson noticed that the Defendant had not touched his beer. Ms. Hanson testified that the Defendant "was flirting like normal" and did not seem incoherent, but did seem "like he was waiting for something."

Jennifer King was the manager at Jonny's on April 2, 2009. At trial, Ms. King testified that the victim "was employed as [the bar's] karaoke host." According to Ms. King, the victim and his wife, Nicole Goeser, would bring their karaoke equipment to the bar every Thursday and run the bar's "karaoke night." Around 10:30 p.m. that evening, Ms. Goeser asked Ms. King to remove the Defendant from the bar. Ms. King testified that she had never seen the Defendant in the bar before, but that she complied with Ms. Goeser's request. The Defendant was standing behind the victim in a doorway between the room where the karaoke equipment was and another part of the bar. The victim was standing at the karaoke equipment, a short distance from where the Defendant was standing. Ms. King and a bartender, George Surginer, approached the Defendant and asked him to leave.

The Defendant wanted to know why he was being asked to leave; Ms. King told him that he was "bothering or making uncomfortable" another patron. Ms. King testified that the Defendant wanted to know who he was bothering and that she responded, "I think you know who." The Defendant then stated that he was "going to go to the bathroom" before he left. Ms. King testified that she had seen the Defendant go to the bathroom earlier and that she told him he "should probably leave now." Ms. King also told the Defendant that if he was "upset about the situation" he could call the next day and speak to her or the owner about it. Mr. Surginer testified at trial that the Defendant was "not threatening at all" during his conversation with Ms. King and that he seemed "very calm" and coherent. Ms. King later told the police that the Defendant was "really quiet, soft spoken, and seemed confused."

As Ms. King turned to walk away, the Defendant unzipped his jacket and pulled out a gun. The Defendant then turned toward the victim and shot him in the head. The victim immediately fell to the ground. The Defendant then stood over the victim and shot him several more times in the torso. In all, the Defendant shot the victim seven times from a distance of "a few inches to a couple feet away." Once the Defendant began shooting, Ms. King ran to the manager's office to call 911. Mr. Surginer testified that after the shooting,

the bar was "[m]ass mayhem" with customers running everywhere. The bar's security cameras recorded the shooting, and the surveillance video was played at trial.

The Defendant attempted to place the gun back into his jacket and walk out of the bar immediately after shooting the victim. Several witnesses described the Defendant as not running or "in a hurry," but "calmly" walking toward the door. Mr. Surginer and several customers tackled the Defendant and held him down until the police arrived. During the struggle, one of the customers took the Defendant's gun and placed it on a nearby table. Another customer picked up the gun and took it to the manager's officer where Ms. King secured it. Todd Kane, one of the customers who stopped the Defendant, testified at trial that the Defendant did not resist when the men tackled him and that he said either, "I give up" or "I'm not resisting."

*B. The Defendant's Arrest and Statements to the Police*

When the police arrived at Jonny's, the Defendant was immediately taken into custody. The Defendant was wearing a shoulder holster when he was arrested and had "some pocket knives" on him. The police recovered the gun used to kill the victim, a .45 caliber handgun, from the manager's office. The Defendant told one of the arresting officers the following: "That's the last time they will send sexually explicit photos of me. They won't doctor any more photos of me. And I leave people alone." The Defendant told another officer that he "was just defending the honor of [his] good name." Detective Derry Baltimore of the Metropolitan Nashville Police Department (MNPD) testified that he interviewed the Defendant in the early morning hours of April 3, 2009. A video recording of Det. Baltimore's interview with the Defendant was played for the trial court.

The Defendant told Det. Baltimore that he had recently moved to Nashville because he had "lost everything in Florida." The Defendant explained that his ex-girlfriend was "obsessively" attached to him and that she threatened to "destroy" him when he broke up with her. The Defendant claimed that his ex-girlfriend got him fired from his job and caused him to lose his house. The Defendant told Det. Baltimore that he met the victim and Ms. Goeser at a local bar where they were running a karaoke night in October or November of 2008. The Defendant stated that he had "communicated a little bit online" with Ms. Goeser and that he thought she was interested in starting a relationship with him. However, the Defendant admitted that he had never talked to Ms. Goeser about a possible relationship. The Defendant repeatedly denied that he had an actual relationship with Ms. Goeser, but stated that he was open to the prospect of a future relationship with her.

The Defendant claimed that some of the victim's friends "gave him grief" over the Defendant's supposed relationship with Ms. Goeser. The Defendant told Det. Baltimore that

the victim thought Ms. Goeser "was having a major relationship with" him. The Defendant also stated that the victim got "all bent out of shape about" his conversations with Ms. Goeser on a social networking website. The Defendant claimed that the victim became jealous and obsessed with the idea that Ms. Goeser was going to leave him for the Defendant. The Defendant further claimed that the victim's friends, family, and co-workers were all convinced that Ms. Goeser would eventually leave the victim for the Defendant. The Defendant told Det. Baltimore that the victim was insecure about his relationship with Ms. Goeser, so the victim decided to help the Defendant's ex-girlfriend destroy his life.

The Defendant claimed that a few months before the shooting, he saw some of the victim's friends at a bar and that they started taking pictures of him. The Defendant told Det. Baltimore that he knew "from their actions, they weren't friendly." The Defendant stated that the victim was a graphic designer and that he believed that the victim had somehow altered the pictures of him. The Defendant claimed that, shortly after his picture was taken by the people at the bar, he started to have "a lot of trouble with people stealing [his] identity and messing with [his] relationships." The Defendant further claimed that he tried "reformatting" his hard drive, but that did not work. The Defendant explained that he was friends with a young woman and that one day he was approached by her father wanting to know why he was sending her "trash" online. The Defendant further claimed that anytime a friendship would "go online" it would "get ugly."

The Defendant believed that the victim had "doctored" photographs of him and had started sending them to his friends in order to make his friends think he had done "terrible things." The Defendant told Det. Baltimore the following, "I just wanted to have some friends, and I only had a few friends. I don't know why they have to do something terrible, you know, like sending them some horrible video that they have modified to make me look bad." When asked what was so "horrible" about the pictures and video, the Defendant told Det. Baltimore that he would have to ask someone who had seen them because he never had. The Defendant explained that he knew about the pictures and video because he had gotten "feedback" from other people about them. The Defendant repeatedly told Det. Baltimore that he did not know who was sending the pictures and video to his friends, but that he believed that the victim had done "all the stuff with the graphics."

The Defendant repeatedly told Det. Baltimore that he did not want to talk about the shooting because it was "not about tonight," because it was "obvious what happened," and because it was "not pleasant" to think about. The Defendant eventually told Det. Baltimore that he had felt like he was "at the end of [his] rope" and had "run out of options." The Defendant said that he had no job, very little money, his friends were abandoning him, and he could not get a job because of what the victim was doing to him online. The Defendant told Det. Baltimore that he became angry at the victim and thought about shooting the victim.

-4-

The Defendant also told Det. Baltimore that he knew the victim had been to Jonny's before and that he went there that night because he thought the victim might be there.

The Defendant told Det. Baltimore that he did not go to the bar planning to kill the victim. The Defendant said that if he had planned to kill the victim he would have just walked into the bar and shot him. Instead, the Defendant went into the bar and talked to the victim "a little bit." The Defendant told Det. Baltimore that his conversation with the victim was mostly small talk about Ms. Goeser's hair. The Defendant did admit that he went to the bar with a shotgun and a rifle in his truck and with a handgun concealed under his jacket. The Defendant explained that the shotgun and rifle were for hunting and that he kept them in his truck because the hotel where he was staying did not "want you to have them" in the room. The Defendant also admitted that carrying a concealed weapon into a bar was "not something [he] normally" did.

The Defendant stated that he did not remember what happened when he shot the victim or how many times he shot the victim because it was "like a blur." The Defendant told Det. Baltimore that he got angry when he was asked to leave the bar and that when he saw the victim, he became very angry about the victim "destroying [his] reputation and sending horrible stuff to people" and then "making it look like it was" the Defendant. The Defendant stated that he did not understand why the victim would "want to destroy [his] life" when he had done nothing to the victim. The Defendant further stated that he shot the victim because of "the hurt and pain that [the victim] had caused" him. The Defendant then told Det. Baltimore that he shot the victim because the victim "was helping people destroy [his] life."

When asked what had happened that night, the Defendant tried to explain his actions by telling Det. Baltimore that the victim was extremely jealous of him. The Defendant then made the following statement:

> I guess they wanted to destroy my life because [the victim] was so obsessively in love with [Ms. Goeser] that he couldn't stand the thought of losing her. I suppose he thought I was trying to take her, which wasn't the case, it might have happened down the road or something. I don't know why they would go to such extremes to make such a wreck out of my life. They were so bent on destroying my life. That's all I can think to tell you.

The Defendant admitted that the victim did nothing that night to provoke him into shooting the victim.

The Defendant told Det. Baltimore that he did not want to shoot the victim, but that the victim had "hurt [him] bad[ly]." The Defendant said that he wished "it wouldn't of happened." Det. Baltimore asked the Defendant if he was "sorry about what happened" and the Defendant responded, "Yeah, yeah I am. I just wanted a normal life." The Defendant reiterated that it was "hurtful to talk about" the shooting. The Defendant told Det. Baltimore that he did not believe that he was innocent and that he had his "part in it," but that his ex-girlfriend and the victim had driven him to killing. Det. Baltimore testified at trial that he asked the Defendant if he was on any medications or had ever been committed because of what the Defendant had said about the "doctored" photographs. However, Det. Baltimore testified that the Defendant was coherent during the interview and that he never thought that the Defendant did not understand what was going on or his questions.

### C. Nicole Goeser's Testimony

Ms. Goeser testified at trial that she was the victim's wife. Ms. Goeser testified that she and the victim met the Defendant in 2008 at a karaoke night they were running. According to Ms. Goeser, she had only exchanged "niceties" with the Defendant when she received a friend request from him on the social networking website MySpace. Ms. Goeser testified that the Defendant began to send her messages on MySpace. The first few messages were normal, but then the Defendant started to ask Ms. Goeser why she was with the victim because he was "too old" for her and told her that it was okay to admit that she "may have made a mistake." Ms. Goeser showed the messages to the victim. Ms. Goeser testified that the victim thought the Defendant had a crush on her, but that he did not get upset about the messages or think much of them.

Ms. Goeser testified that in January 2009, she had posted a message on a friend's MySpace profile that simply said "get out." The Defendant saw Ms. Goeser's post and sent her the following message: "Hey, what happened to [the victim], did he move out? I saw a message from you saying 'get out' [and] thought maybe that's why you were lonely?" Ms. Goeser testified that this message made her feel uncomfortable, so she responded by telling the Defendant that she was happily married. The Defendant responded to this by sending Ms. Goeser the following two messages:

[1.]    Hey you, OK [sic] so you put a question in there and want an answer. So here it is, I saw that picture of you in the black dress and you said you were lonely and emotionally drained then I saw the message about "Get Out" so I put those together and figured it was all tied together. I figure you wouldn't be lonely.

[2.]     Just thought I'd tell you before I go on my trip. I don't like this new picture. It printed out like a postage stamp. Gee I thought the black dress picture was bad. . . You should really take this one off here. You look terrible like you just woke up or something, no smile, bad hair day . . . old wrinkly clothes . . . Good Grief!  lol  Every Miles [sic.] a Memory!

Ms. Goeser testified that after receiving these messages she "deleted" the Defendant from her MySpace profile.

Ms. Goeser testified that the victim spoke to the Defendant about the MySpace messages a month before the shooting. The victim told the Defendant that he had read the messages and that they had scared Ms. Goeser. The victim then asked the Defendant to "please leave [his] wife alone." The Defendant wanted to know if Ms. Goeser was mad and swore that "it wasn't [him]." The Defendant blamed the messages on "a crazy ex-girlfriend who [knew] how to hack into [his] account." Ms. Goeser testified that the victim did not seem concerned or scared by the situation.

However, a few weeks later the Defendant showed up at a different bar and just "stared" at her. Ms. Goeser began to worry that the Defendant was stalking her. The day before the shooting, the Defendant posted the following on his MySpace account:

FOREVER UNFORGIVEN!  I know who you are,,,!  RUN...
When I catch up with you I'm going to write the FN book on cruel...
You haven't seen my bad side yet MFR but your [sic] going to...
Its [sic] going to be EXTREMELY painful!!! [W]here are you going to work
that I won't find you,,,lunch, dinner, supper,, sleep,, every FN moment..
You're FOREVER UNFORGIVEN!
What [k]ind of life do you have now!

Ms. Goeser was alarmed when she saw him at Jonny's the night of the shooting because she had never seen the Defendant there before. Ms. Goeser saw the Defendant speak to the victim. Ms. Goeser testified that their conversation was not "animated" and that the victim did not seem mad. Ms. Goeser told the victim that she was going to ask Ms. King to kick the Defendant out of the bar and that the victim told her to "do what you have to."

*II. Evidence Regarding the Defendant's Mental State*

*A. Evidence from the Defendant's Family*

The Defendant's sister, Dainta Balzli-Pilgrim, testified at trial that she became concerned about the Defendant's mental health in 2008. Ms. Balzli-Pilgrim testified that she visited the Defendant in April 2008 at his home in Florida. According to Ms. Balzli-Pilgrim, the Defendant seemed normal at first but then he started telling her "things that [his ex-girlfriend] had been doing." The Defendant claimed that his ex-girlfriend "had poisoned him with some tea bags" and that he had taken the tea bags to the local sheriff's office but they did nothing. Ms. Balzli-Pilgrim also noticed that the Defendant had security cameras "up around the home." He told her that he put them up because he was afraid that his ex-girlfriend "was going to retaliate in some way" and that she "had family in the police force." The Defendant was also concerned about the fact that Ms. Balzli-Pilgrim used a cell phone and told her to "watch" her computer because people could "hack into" it.

Ms. Balzli-Pilgrim testified that the Defendant lost his job about a year before the shooting and that he moved to Tennessee to start over and launch a music career. Ms. Balzli-Pilgrim spoke to the Defendant the weekend before the shooting. The Defendant told her that his ex-girlfriend had "connections in Tennessee" and that "he felt like someone was going to kill him." The Defendant told Ms. Balzli-Pilgrim about "an incident where he was at a bar and he was sitting with two women and a guy . . . and they started to take pictures of him." The Defendant said that this made him feel "very uncomfortable" because "they can Photoshop [pictures] and make them appear to be that he [had] done something he [had not] done." The Defendant told his sister that as the women were leaving, one of them turned to him and "made the cut throat [] sign." Ms. Balzli-Pilgrim told the Defendant that she doubted that his ex-girlfriend was "trying to follow [him] to Tennessee."

The Defendant's father, Robert Balzli, testified that he started to worry about the Defendant's mental health in 1997. Mr. Balzli testified that the Defendant made "negative comments" about his then wife and lied about working at a "wind farm." Mr. Balzli's concerns about the Defendant continued after he moved to Florida. Mr. Balzli recalled an incident where some hunters accidently "shot pellets onto [the Defendant's] property." The Defendant reacted by getting a shotgun and "blasting over" the hunters. The Defendant then got in his truck and went "over to where the hunters [were] and [got] in their face[s] big time." Mr. Balzli also recalled an incident where the Defendant killed all of the fish in his pond by dying the water, but the Defendant insisted that "the locals [had] poisoned his pond."

Mr. Balzli testified that at a family cookout in 2007, the Defendant claimed that his ex-girlfriend had "put some knockout drops in [the] horseradish" to make him pass out so she could have sex with his half-brother. Mr. Balzli also testified about the Defendant's belief that his ex-girlfriend had poisoned several tea bags. Mr. Balzli thought that his wife had brought the tea bags to the Defendant's home. He tried to explain to the Defendant several times that they were not poisoned, but the Defendant "would not listen to any reason"

regarding his beliefs. Mr. Balzli further testified that the Defendant had been fired from his job in Florida after he refused to see a psychologist. The Defendant was ordered to see a psychologist because he had gotten "in the face of his secretary [] and scared the stew out of her" because he believed that she was a "spy" for his ex-girlfriend.

Mr. Balzli testified that the Defendant "closed his cell phone" in 2008, but that the Defendant called him in January 2009 to tell him that he was moving to Nashville. The Defendant told Mr. Balzli that he was just taking his musical instruments with him and that he had left all of his other belongings in Florida because he did not want them. After the shooting, Mr. Balzli went to the Defendant's home to take "care of his business." Mr. Balzli testified that the Defendant had "destroyed his place." According to Mr. Balzli, the appliances had been shot, the furniture had been cut with a chainsaw and a meat cleaver, and his electronics had been smashed with a hammer. The Defendant had also killed the shrubs and plants outside his home. Underneath the house, Mr. Balzli found a "spy center" with several camera wires leading to a computer with a monitor, "a battery for backup power," and a stool. Near the "spy center" were "bottles of gasoline and numerous fireworks."

Mr. Balzli testified that after the shooting, the Defendant told him that the victim "was a graphic designer and that he had taken some pictures, pornographic pictures, and superimposed [the Defendant's] image on them." The Defendant also told Mr. Balzli that his ex-girlfriend and the victim "had hacked into his MySpace account and sent these pictures to [the Defendant's] friends," including Ms. Goeser, and that the shooting "was justifiable homicide because [the victim] was slandering him, defaming his honor." Ms. Balzli-Pilgrim also testified that the Defendant "felt [that] he was a victim" and that the truth would come out at his trial. Ms. Balzli-Pilgrim further testified that the Defendant "felt justified in doing what he did because they were trying to kill him." Both Ms. Balzli-Pilgrim and Mr. Balzli testified that the Defendant had been "consistent" with his story since the shooting. Mr. Balzli testified that the Defendant had recently filed a motion in court "to have all of these people arrested that [were] spying on him."

*B. The Defendant's Expert Evidence*

Kimberly Brown, PhD, a clinical psychologist and expert in forensic psychology, testified that she evaluated the Defendant pursuant to a court order in order to determine his mental state at the time of the offense. Dr. Brown testified that she interviewed the Defendant on six separate occasions and conducted psychological tests on the Defendant. Dr. Brown also interviewed members of the Defendant's family, his ex-wife, the victim's wife, and other people who knew the Defendant when he lived in Nashville. Additionally, Dr. Brown reviewed discovery documents provided by defense counsel, numerous writings by the Defendant, and the Defendant's employment records. Based upon her evaluation, Dr.

Brown concluded that the Defendant "had a mental illness at the time of the crime that left him unable to appreciate the wrongfulness of his conduct."

Dr. Brown diagnosed the Defendant with "a pretty classic case of delusional disorder." Dr. Brown explained that delusional disorder "is a psychotic disorder" where "the person grossly misperceives events and reality and draws faulty interpretations and conclusions about what is happening." Dr. Brown testified that persons who suffer from delusional disorder have "false beliefs" that become "fixed" and are "very difficult to change or reason with." Dr. Brown further explained that "individuals with delusional disorder take pieces of information and they connect them in ways that they shouldn't be connected or see meaning and causation between things that are really not related." According to Dr. Brown, delusional disorder involves "non-bizarre delusions" and sufferers "look, act, [and] talk fairly normally until you talk about the content of those delusional beliefs."

Dr. Brown testified that the Defendant's delusional disorder was "[e]asy" to miss and that the Defendant was able to "keep a job, make a good income, and his intellect wasn't compromised at all" by the disorder. However, Dr. Brown testified that the disorder caused the Defendant to hold irrational beliefs that "lead to faulty judgment" and "decision making." Dr. Brown further testified that the Defendant went to great lengths to attempt to confirm his delusional beliefs. According to Dr. Brown, the Defendant's mental health problems appeared to go back to the mid-1990s. In 1996, the Defendant's co-workers reported that he was "doing strange things" and that they were "worried for their safety." The Defendant would slam doors, make "threatening gestures," and threatened to kill his secretary. The Defendant's employer required him to see a psychologist for a "fitness for duty evaluation." The Defendant felt that this was an "injustice" and that his employer was trying to force him onto "disability." The Defendant also believed that he was sexually harassed by a supervisor and that his employer "covered up" the incident by "tampering with his witnesses."

Dr. Brown testified that the Defendant's more recent delusions centered around his ex-girlfriend. To illustrate this, Dr. Brown showed the trial court two "chained conspiracy" diagrams the Defendant had made for her listing seemingly random people and events and how the Defendant claimed they connected to his ex-girlfriend. The Defendant believed that his ex-girlfriend was "out to get him . . . both psycholgoical[ly] and physically." For example, the Defendant believed that his ex-girlfriend was attempting to poison him, so he would not eat food "unless he knew that it had come directly from the store." Dr. Brown also testified that when the Defendant believed that his ex-girlfriend had poisoned several tea bags, he took them to the local sheriff's office. The Defendant believed that the sheriff's office was "in cahoots" with his ex-girlfriend because they did nothing about his claims. The Defendant also believed that his ex-girlfriend was planning to "use law enforcement" to kill him.

The Defendant explained to Dr. Brown that his ex-girlfriend wanted to kill him because she was obsessed with him and unable "to accept him not wanting to be with her." The Defendant told Dr. Brown that his ex-girlfriend had enlisted "law enforcement" to spy on him by flying planes over his house and by "tracking him through GPS on his truck and through his cell phone and through his computer." The Defendant also believed that the man staying in the hotel room above his in Nashville had been sent to Tennessee by his ex-girlfriend to spy on him and was tracking him through a GPS device on his truck. Dr. Brown testified that the Defendant believed that his ex-girlfriend and the victim collaborated in a plot to destroy his life because they "were both motivated by jealousy and obsession over someone they loved," the Defendant's ex-girlfriend "being obsessed" with the Defendant and the victim "being obsessed over" Ms. Goeser.

The Defendant explained to Dr. Brown that Ms. Goeser "liked" him a lot and that he knew this based upon "non verbals" he saw that were not "obvious" to other people. This caused the Defendant to believe that the victim was jealous of him and obsessed with losing Ms. Goeser. Dr. Brown testified that when the Defendant saw a woman make "the cut throat sign" after his picture was taken by some strangers at a bar, the Defendant "concluded that those pictures were going to be used to do something really bad." Because the victim was a graphic designer, the Defendant believed that the people at the bar were the victim's friends and that the victim had a plan to alter the pictures into "disgusting pornographic images" and to send them to his friends over the internet. The Defendant told Dr. Brown that the victim had partnered with his ex-girlfriend because she had stolen his "online identity" and was using his MySpace account.

The Defendant admitted to Dr. Brown that he had never actually seen the allegedly altered pictures, but he assumed the "worst" about them. The Defendant started to tell people that "they might be getting bad messages or things about him but it wasn't him, he wasn't the one sending them." The Defendant also thought that his friends on MySpace were "not being their true self [sic.]." The Defendant believed that the fake pictures of him had penetrated "his small circle of friends" and that his life was "being tainted, spoiled, and destroyed." Dr. Brown testified that in the time leading up to the shooting, the Defendant "felt like he was at the end of his rope" and started to consider killing himself. The Defendant told Dr. Brown that he actually put a gun to his head, but decided that if he killed himself, "the bad guys are going to win and no one is going to be able to hear [his] story."

Dr. Brown testified that the Defendant's post on MySpace the day before the shooting was an example of "his black and white thinking" at that time. Dr. Brown also testified that the Defendant told her that during that time, he had "bad thoughts" about physically harming the victim either by beating him or shooting him. Dr. Brown testified that these fantasies and the MySpace posting made the Defendant feel like he had some power over his situation at

a time when he felt powerless. Dr. Brown further testified that the Defendant went to Jonny's with the fantasy of hurting the victim and "getting answers" from him. Dr. Brown testified that the Defendant did not have a plan of what to do when he went to Jonny's on April 2, 2009.

The Defendant told Dr. Brown that he spoke to the victim prior to the shooting and that they talked about Ms. Goeser's new hair color. The Defendant told Dr. Brown that the victim was nice to him and that he smiled and smirked at him. The Defendant claimed that he had never seen the victim smile before and that he thought the smile was the victim's way of admitting that he had altered the Defendant's pictures. According to Dr. Brown, Ms. King's request that the Defendant leave the bar was the "last insult." Dr. Brown testified that the Defendant's intensity of emotion and delusional beliefs over took him and caused him to shoot the victim. The Defendant told Dr. Brown that it was "all about the pictures" and that he thought about "how bad those pictures might be" when he shot the victim. The Defendant also told Dr. Brown that he walked away from the victim after shooting him because he no longer had a "reason" to stay and that he felt "regretful by that point." The Defendant believed that killing the victim would "put a stop to it all."

Based upon the foregoing, Dr. Brown opined that the Defendant had the capacity to act intentionally but lacked the capacity to act with premeditation. Dr. Brown explained that the Defendant was "overloaded emotionally" when he shot the victim and that "there was no more rationality happening at that point." Dr. Brown testified that the Defendant was able to appreciate the nature of his acts at the time of the shooting. But Dr. Brown opined that "because of his delusional disorder [the Defendant] was not able to appreciate the wrongfulness of his acts." Dr. Brown explained that "wrongfulness" could be either legal, "simply knowing that the act is against the law," or moral, which Dr. Brown defined as whether the act was "justified."

Dr. Brown testified that the Defendant believed that shooting the victim was an act of self-preservation and that he felt he had no other option. Dr. Brown explained that the Defendant's thinking was illustrated by his statement to Det. Baltimore. Dr. Brown testified that the Defendant repeatedly focused on what he thought the victim had done to him, how the victim had destroyed his life, and how hurt he felt by what he believed had been done to him. Dr. Brown further testified that the Defendant's statements that he was not innocent and had his "part" in the shooting were examples of how the Defendant knew he had killed someone but felt justified in his actions. Dr. Brown dismissed the Defendant's later statements of regret because she thought they were not representative of his mental state at the time of the offense. Dr. Brown concluded that the Defendant could not appreciate that his actions were morally wrong because he felt justified in shooting the victim; therefore, he could not appreciate the wrongfulness of his conduct.

*C. The State's Rebuttal Evidence*

Thomas Schacht, PhD, a clinical psychologist and expert in forensic psychology, testified in rebuttal for the State. Dr. Schacht testified that he evaluated the Defendant at the request of the State. Dr. Schacht further testified that he reviewed the State's file, Dr. Brown's file and report, and interviewed the Defendant in order to conduct his evaluation. Dr. Schacht agreed with Dr. Brown's diagnosis that the Defendant suffered from delusional disorder. Dr. Schacht also agreed with Dr. Brown's conclusion that the Defendant was able to appreciate the nature of his conduct. However, with respect to whether the Defendant was able to appreciate the wrongfulness of his conduct, Dr. Schacht believed that Dr. Brown's opinion "exceed[ed] the permissible scope of expert testimony in an insanity case."

Dr. Schacht explained that "the law has not clearly articulated what is meant by the term wrongfulness." Dr. Schacht testified that he believed "wrongfulness" was "whatever that means to an ordinary person." As such, Dr. Schacht believed that the determination of whether a defendant was able to appreciate the wrongfulness of his conduct was "not a matter for expert judgment," but was to be decided by the trier of fact. Therefore, Dr. Schacht declined to opine as to whether the Defendant was able to appreciate the wrongfulness of his conduct at the time of the offense. Instead, Dr. Schacht testified that he wanted to show the trial court that different interpretations could be made from the facts of the case. Dr. Schacht further testified that he believed Dr. Brown's opinion had "merit," but that there was "other evidence in the record that could point to an opposite conclusion that was not recited or analyzed in her report."

Dr. Schacht noted that Dr. Brown's opinion focused on the fact that the Defendant felt justified in shooting the victim. According to Dr. Schacht, the Defendant's statements of justification "could reflect . . . [a] failure to appreciate the wrongfulness of an act," but they could also "reflect an effort to introduce considerations of proportionality into [the Defendant's] account of events," evidencing an appreciation of the wrongfulness of the act. For example, Dr. Schacht noted that after the shooting, the Defendant told members of his family that what he believed the victim had done was the "higher transgression." The Defendant also discussed with Dr. Brown which homicide statute he thought he should have been charged with and that he was surprised to be charged with first degree premeditated murder given his perceived justifications. The Defendant also told Dr. Brown that he did "something terribly wrong" but that he hoped "that extenuating circumstances" would result in a lesser sentence.

Dr. Schacht explained that the Defendant's consideration of the proportionality of his act "could [] support a finding that he understood it was wrongful but he just [thought] it was less wrongful" than what he believed the victim had done to him. Put another way, "[i]f you

are thinking about proportionality, you are aware of wrongfulness at some level, you are just involved in a dispute about the degree." Furthermore, Dr. Schacht asked the Defendant if he thought he "had a legal right to threaten people with a gun" or if he considered any "legal way" to deal with what he believed the victim had done to him. Dr. Schacht testified that the Defendant's "answers were consistent with an inference that he understood at the time of [the] interview that his conduct in that regard was unlawful." Dr. Schacht explained that unlike Dr. Brown, he did not think of legal and moral wrongfulness as "two different categories," but that legal wrongfulness was "one kind of moral wrongfulness."

Dr. Schacht noted that the Defendant's MySpace post the day before the shooting mentioned that people had not "seen [his] bad side yet" and that the Defendant had told Mr. Balzli in the past that he had "a dark side that no one had seen." Dr. Schacht testified that these statements were "an indication that [the Defendant] was aware that he had the potential for unacceptable conduct" and that he had "some capacity for self-restraint." Dr. Schacht continued, "[W]hat is the purpose of the self-restraint if not that it reflects some awareness that this behavior would not be a good thing to do." Dr. Schacht also noted that the Defendant "hunt[ed]" for the victim on the night of the shooting and made "a variety of physical preparations" that day, including buying a "shoulder holster, baseball bat, [and] a pair of binoculars." The Defendant also had multiple weapons with him when he went to Jonny's.

Dr. Schacht noted that the Defendant did not keep guns in his hotel room even though he believed that the man staying in the room above him was a spy for his ex-girlfriend and possibly out to kill him. Dr. Schacht testified that the Defendant's reason for not keeping the guns in his hotel room was that "management didn't allow that." Dr. Schacht opined that this demonstrated that the Defendant "understood rules and regulations as far as brining a gun into someplace he wasn't suppose to." The Defendant also admitted to Dr. Brown that he had considered confronting the victim with "alternatives [to killing him] that were violent but didn't involve the use of lethal force." The Defendant referred to these as "bad thoughts," and Dr. Schacht testified that this characterization "could be understood as a synonym for appreciations of wrongfulness." Dr. Schacht also testified that a "preference for inflicting a painful but non-lethal wound . . . could be understood as reflecting an exercise of moral judgment about the proportionality of appropriate revenge."

Dr. Schacht testified that "fleeing" from a crime "can be regarded as evidence of . . . an awareness of wrongfulness." Dr. Schacht noted that the Defendant told Dr. Brown he tried to leave Jonny's after the shooting because, in part, he felt "regretful" about killing the victim. Dr. Schacht testified that "regret is commonly viewed as a retrospective indicator of [a] capacity to appreciate wrongfulness." Dr. Schacht further testified that the Defendant made "multiple statements that could be heard as expressions of remorse, or regret" during

-14-

his interview with Det. Baltimore. For example, the Defendant stated that he wished the shooting did not happen, answered yes when asked if he was sorry about what happened, said it was "hurtful" to talk about the shooting, and admitted that he had his "part in it." Dr. Schacht testified that the Defendant also demonstrated several "nonverbal behavior[s]" during the interview "that could be indicative of a state of shame," such as averting his gaze, looking down, and covering his face.

### III. Trial Court's Verdict

In issuing its verdict, the trial court began its analysis by addressing whether the Defendant had proved by clear and convincing evidence that the he could not appreciate the wrongfulness of his conduct due to a severe mental disease or defect. The trial court stated that it had "two opposing positions" before it and had been presented with "two opposing opinions." The trial court then stated as follows:

> Now, how can I disregard one opinion as to the other opinion? How can I just say, this idea is out the window and I must accept this idea? That's not what the law says. I have the authority as a juror or the trier of fact to disregard testimony if I find it to be untrue, which of course I cannot.
>
> As far as an expert witness is concerned, the law tells me that I can give such weight to the testimony of an expert witness as I think it deserves after taking into consideration the background of the witnesses or the education of the witness and the knowledge from which they speak.
>
> In looking at both of these, this Court cannot find by clear and convincing evidence that the [D]efendant did not understand the wrongfulness of his act. This Court cannot see the defense of insanity in this case.

The trial court then concluded that the State had failed to prove premeditation beyond a reasonable doubt and convicted the Defendant of the lesser-included offense of second degree murder.

### IV. Sentencing

At the Defendant's sentencing hearing, Ms. Goeser; the victim's daughter, Tia Winford; and the victim's friend, Kent Alexander, all testified about the victim's joyful personality and the severe impact his death has had on his friends and family. Bill Regan, PhD, testified on behalf of the Defendant. Dr. Regan testified that he was a staff psychiatrist at the Middle Tennessee Mental Health Institute (MTMHI) and that he evaluated the

Defendant a month before the hearing. Dr. Regan testified that he prescribed a new medication to the Defendant which "helped him a little bit." Dr. Regan further testified that about one-third of people who suffer from delusional disorder "significantly improve" with medication. The remainder see little or no improvement. According to Dr. Regan, it was "hard to say" if the Defendant would see significant improvement on the medication, but "he did have some response." Dr. Regan also testified that the Defendant did not pose a threat to anyone while he was at MTMHI and that the Defendant stated that he was "of course" remorseful for killing the victim, that he thought about it "every day," and that he would for the rest of his life.

The State requested that the Defendant receive the maximum sentence of twenty-five years. The State argued that the Defendant had a previous history of criminal behavior citing the Defendant's "destruction of . . . his [own] property" and "the acts of violence . . . against the people that came on his land" that Mr. Balzli testified about during the trial. See Tenn. Code Ann. § 40-35-114(1). The State further cited "the threats that were made throughout the proof." The State also argued that the Defendant employed a firearm during the commission of the offense and that he had no hesitation about committing a crime when the risk to human life was high. See Tenn. Code Ann. § 40-35-114(9), (10). The Defendant argued that the following mitigating factors applied: that substantial grounds existed tending to excuse or justify the Defendant's criminal conduct, though failing to establish a defense; that the Defendant was suffering from a mental condition that significantly reduced his culpability for the offense; and that the Defendant committed the offense under such unusual circumstances that it was unlikely that a sustained intent to violate the law motivated the criminal conduct. See Tenn. Code Ann. § 40-35-113(3), (8), (11).

The trial court began its sentencing decision by addressing the first two mitigating factors proposed by the Defendant, stating as follows:

> I don't know that I have any proof of such thing[s]. It was all submitted to the jury[1] . . . . The jury was allowed to consider voluntary manslaughter, which could have been in the heat of passion, but that is not necessarily what the defense is saying at this point in time so, to me, there is no proof to substantiate those.

(Footnote added). With respect to the Defendant's third proposed mitigating factor, the trial court stated as follows:

---

[1] Neither party corrected the trial court's mistake that this was a bench trial, not a jury trial, at the sentencing hearing or at the motion for new trial hearing.

-16-

My recollection from the proof was that [the Defendant] went . . . looking for this particular individual, and as I recall asked even how to get to [Jonny's] and was armed with a weapon at that time.

I don't think most people, although there seems to be an awful lot of people do go armed with a weapon, I don't think they go asking for how to find somebody if they don't have some particular intent in mind.

The trial court found that none of "the mitigating factors apply in this particular case."

The trial court made the following statement regarding the State's proposed enhancement factors:

I think the State has shown proof through their proof and through the testimony at trial of the [Defendant] that the [Defendant] is guilty of past criminal conduct, not convictions but conduct. Also, I find that the risk to human life was in danger. When you walk into a crowded club and start firing a weapon, [f]actor [number] ten has got to apply.

The trial court made no statement regarding whether the enhancement factor of the employment a firearm during the commission of the offense applied to this case. The trial court then sentenced the Defendant to twenty-three years to be served at one hundred percent.

## ANALYSIS

### I. Insanity Defense

The Defendant contends that the trial court erred by failing to find him not guilty by reason of insanity. The Defendant argues that the trial court's verdict "was not supported by the evidence" and that he "established by clear and convincing evidence that he was legally insane at the time of the commission of the offense." The Defendant specifically argues that the trial court "mistakenly concluded that Dr. Schacht's testimony contradicted Dr. Brown's on the issue of whether the [D]efendant appreciated the wrongfulness of his acts, thereby leaving that issue . . . in equipoise." The Defendant argues that Dr. Brown's testimony was "unrebutted" because Dr. Schacht refused to opine on whether the Defendant appreciated the wrongfulness of his conduct and "employed a legally incorrect interpretation of wrongfulness in his report." Therefore, the Defendant concludes that he established by clear and convincing evidence his insanity at the time of the offense.

The State responds that the evidence supports the trial court's conclusion that the Defendant failed to carry the burden of proving insanity by clear and convincing evidence. The State argues that the trial court "considered the evidence under the correct legal standard and found that the [D]efendant failed to meet his burden." The State further argues that it "was not required to definitively rebut the [D]efendant's proof of insanity"; therefore, it did not have to present an expert with an opinion that contradicted Dr. Brown's opinion. The State also argues that, while Dr. Schacht did not offer a contradictory opinion, he did testify in detail about several aspects of the evidence that could be used to support a conclusion differing from Dr. Brown's. As such, the State concludes that the trial court did not err in concluding that the Defendant failed to prove insanity by clear and convincing evidence.

*A. Standard of Review*

Tennessee Code Annotated section 39-11-501 provides as follows:

(a) It is an affirmative defense to prosecution that, at the time of the commission of the acts constituting the offense, the defendant, as a result of a severe mental disease or defect, was unable to appreciate the nature or wrongfulness of the defendant's acts. Mental disease or defect does not otherwise constitute a defense. The defendant has the burden of proving the defense of insanity by clear and convincing evidence.

(b) As used in this section, mental disease or defect does not include any abnormality manifested only by repeated criminal or otherwise antisocial conduct.

(c) No expert witness may testify as to whether the defendant was or was not insane as set forth in section (a). Such ultimate issue is a matter for the trier of fact alone.

On appeal, this court will "reverse a jury verdict rejecting the insanity defense only if, considering the evidence in the light most favorable to the prosecution, no reasonable trier of fact could have failed to find that the defendant's insanity at the time of the offense was established by clear and convincing evidence."[2] State v. Flake, 88 S.W.3d 540, 554 (Tenn. 2002). As such, "[w]here the proof is contested, appellate courts should rarely reverse a jury's rejection of the insanity defense under this deferential standard of review." Id. at 556.

---

[2] Clear and convincing evidence is evidence "in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." Hodges v. S.C. Toof & Co., 833 S.W.2d 896, 901 n.3 (Tenn. 1992).

This standard is similar "to the familiar sufficiency standard which appellate courts" apply when reviewing the sufficiency of the convicting evidence. Id. at 554. The "same standard is also applied to findings from a bench trial." State v. Richard Anthony Arriola, No. M2007-00428-CCA-R3-CD, 2008 WL 1991098, at *5 (Tenn. Crim. App. May 8, 2008).

### B. Scope of Expert Testimony

At the outset, we note that both Dr. Brown and Dr. Schacht were incorrect in their interpretations of what they were allowed to testify to regarding the Defendant's insanity defense. Dr. Brown testified that the Defendant was unable to appreciate the wrongfulness of his conduct at the time of the offense due to his delusional disorder. In contrast, Dr. Schacht declined to give an opinion as to whether the Defendant could appreciate the wrongfulness of his conduct because he felt that was an issue to be decided by the trier of fact. Subsection (c) of section 39-11-501 states that "[n]o expert witness may testify as to whether the defendant was or was not insane . . . . Such ultimate issue is a matter for the trier of fact alone."

This court has previously stated that subsection (c) must be construed "narrowly because of the interests at stake." State v. Perry, 13 S.W.3d 724, 742 (Tenn. Crim. App. 1999). To that end, an expert "may testify that the defendant suffered from a severe mental disease or defect" and "may also state whether the defendant could have appreciated the nature or wrongfulness of his conduct at the time of the offense." Id. However, subsection (c) "does prevent [an] expert from stating that the severe mental disease or defect operated to prevent the defendant from appreciating the nature or wrongfulness of his conduct." Id. "[T]he jury must render the ultimate determination as to the effect of [the] mental disease on the defendant's understanding of his conduct at the time of the offense." Id.

Dr. Brown's testimony exceeded the scope of permissible testimony for an expert witness regarding the Defendant's insanity defense and encroached upon the ultimate issue to be decided by the trier of fact. Conversely, Dr. Schacht, due to his misinterpretation of the law, unnecessarily declined to give a permissible opinion as to whether the Defendant appreciated the wrongfulness of his conduct at the time of the offense. It is our opinion that the issue of the trial court's rejection of the Defendant's insanity defense would have been less confused had the parties addressed the permissible scope of the expert witnesses' testimony during the trial court's proceedings.

### C. Definition of "Wrongfulness"

The Defendant claims that Dr. Schacht "employed a legally incorrect interpretation of wrongfulness in his report" which focused on legal wrongfulness rather than moral

wrongfulness. Dr. Schacht testified that he did not think of legal and moral wrongfulness as "two different categories," but that legal wrongfulness was "one kind of moral wrongfulness." Dr. Brown's opinion focused on the Defendant's feelings of justification for killing the victim and that this showed that the Defendant was unable to appreciate the moral wrongfulness of his actions. The Defendant argues that if he was unable to appreciate either the legal or moral wrongfulness of his actions then he satisfied his burden of proof. The trial court specifically rejected this argument stating that "it has been argued that there are either [] legal or moral aspect[s] of wrongfulness. That's not the law . . . as far as I [can] determine that has never been categorized or set out in [] section . . . 39-11-501."

The General Assembly did not include a definition for wrongfulness when it adopted section 39-11-501 in 1995. Brian Val Kelley v. State, No. M2004-01158-CCA-R3-PC, 2005 WL 2255854, at *7 (Tenn. Crim. App. Sept. 15, 2005), perm. app. denied, (Tenn. Feb. 27, 2006) (Kelley II). However, the Tennessee Pattern Jury Instruction for the insanity defense characterizes wrongfulness as a defendant's inability "to understand that what he was doing was wrong." T.P.I.-Crim. 40.16(b). This court has previously held that such an instruction was "a complete and correct charge of the current law concerning an insanity defense." State v. Brian Val Kelley, No. M2001-00461-CCA-R3-CD, 2002 WL 927610, at *25-26 (Tenn. Crim. App. May 7, 2002), perm. app. denied, (Tenn. Oct. 21, 2002). Likewise, this court has previously declined "to broaden or narrow" the term wrongfulness because the General Assembly "felt [it] required no further elaboration" beyond its natural and ordinary meaning. Kelley II, 2005 WL 2255854, at *8. Therefore, we conclude that the trial court did not err in rejecting the Defendant's argument with respect to the definition of wrongfulness.

*D. The State's Burden to Rebut the Defendant's Expert Witness*

The gravamen of the Defendant's argument is that he established his insanity by clear and convincing evidence because the State failed to rebut Dr. Brown's opinion with a contradictory expert opinion. While the State "is required to prove all essential elements of a crime beyond a reasonable doubt, sanity is not an element of a crime." State v. Holder, 15 S.W.3d 905, 911 (Tenn. Crim. App. 1999). Section 39-11-501 "places the burden of establishing this affirmative defense squarely on the defendant." Flake, 88 S.W.3d at 554. To that end, our supreme court has "explicitly reject[ed] the notion that the State must rebut defense proof of insanity with substantial evidence." Id. The State may counter the defendant's proof "by contrary expert testimony, lay witnesses, or vigorous cross-examination designed to undermine the credibility of the defense expert[]." Id.

"In determining whether a defendant is insane, [the trier of fact] is entitled to consider all the evidence offered, including the facts surrounding the crime, the testimony of lay witnesses, and expert testimony." Flake, 88 S.W.3d at 556. The trier of fact is to determine

the weight and value to be given to expert testimony regarding the defendant's claim of insanity. Id. at 554. "Where there is a conflict in the evidence, the trier of fact is not required to accept expert testimony over other evidence and must determine the weight and credibility of each in light of all the facts and circumstances of the case." Id. The trier of fact "may not arbitrarily ignore [expert] evidence," but it is "not bound to accept the testimony of experts where the evidence is contested." Id. at 556.

For example, in State v. Holder this court upheld a trial court's rejection of the insanity defense despite the fact that both of the experts who testified at trial opined that the defendant was unable to appreciate the wrongfulness of his conduct. 15 S.W.3d at 902, 912. Instead, the trial court "relied primarily, upon the actions and words of the defendant before, at and after the commission of the offense." Id. at 912. The trial court "relied heavily on [the] defendant's statement" to the police in which he "acknowledged that he knew killing 'was wrong.'" Id. at 910. The trial court also relied upon the defendant's later attempts to provide "some justification" or excuse for his having killed the victim. Id. Additionally, the trial court relied on the defendant's refusal to drive on a suspended license "as indicative of his appreciation for the difference between lawful and unlawful." Id.

Similarly, in State v. Flake our supreme court upheld a jury's rejection of the insanity defense despite the fact that four expert witnesses testified at the trial that the defendant was unable to appreciate the wrongfulness of his conduct. 88 S.W.3d at 544-48, 56-57. Another expert opined that the defendant was able to appreciate the wrongfulness of his conduct, but felt morally justified in his actions. Id. at 547. However, our supreme court noted that "the facts surrounding the offense suggest[ed] the defendant realized his conduct was wrongful." Id. at 556. These facts included that the defendant shot only the victim, fled after the shooting, "appeared to realize he had committed a crime," and exhibited "no bizarre behavior." Id.

Here, there is no doubt that the Defendant suffered from a severe mental disease, delusional disorder. However, the evidence was contested as to whether the Defendant was able to appreciate the wrongfulness of his conduct. Dr. Brown opined that the Defendant was unable to appreciate the wrongfulness of his conduct because he felt justified in killing the victim and viewed the act as one of self-preservation. Dr. Schacht, on the other hand, noted several facts surrounding the offense that could lead to the opposite conclusion. Chiefly, Dr. Schacht noted that the Defendant's statements about feeling justified in shooting the victim could illustrate that the Defendant was "aware of wrongfulness at some level" and simply challenging "the degree" of wrongfulness.

Dr. Schacht also noted that the Defendant attempted to flee after the shooting and made several statements to Det. Baltimore expressing his regret for shooting the victim.

-21-

Prior to the shooting, the Defendant searched for the victim and purchased a shoulder holster and baseball bat. None of the witnesses testified that the Defendant behaved unusually prior to or after the shooting. In later interviews, the Defendant made statements that demonstrated that he understood that his conduct was unlawful and admitted to fantasizing about confronting the victim with non-lethal violence. The Defendant also told Det. Baltimore that he did not keep guns in his hotel room, despite believing that another guest was a spy for his ex-girlfriend, because he understood that he was not allowed to. There being a conflict in the evidence between Dr. Brown's expert opinion and the facts surrounding the offense, we will not disturb the trial court's verdict. Accordingly, we conclude that the trial court did not err by rejecting the Defendant's insanity defense.

## II. Length of Sentence

The Defendant contends that the trial court erred by imposing an excessive sentence. The Defendant argues that the two enhancement factors applied by the trial court were unfounded. The Defendant also argues that the trial court erred by declining to apply his proposed mitigating factors. The Defendant further argues that his sentence of twenty-three years was greater than what he deserved for killing the victim. The State responds that the trial court did not abuse its discretion in imposing a within-range sentence. The State further responds that the enhancement factors were warranted and that a third enhancement factor applied but was not addressed by the trial court. The State also responds that the trial court took the Defendant's mental illness "into account" by sentencing the Defendant to less than the maximum possible sentence.

Appellate courts are to review "sentences imposed by the trial court within the appropriate statutory range . . . under an abuse of discretion standard with a presumption of reasonableness." State v. Bise, 380 S.W.3d 682, 709 (Tenn. 2012) (internal quotation marks omitted). A sentence will be upheld "so long as the statutory purposes and principles [of the Sentencing Reform Act] . . . have been properly addressed." Id. at 706. If this is true, this court may not disturb the sentence even if a different result were preferred. State v. Carter, 254 S.W.3d 335 (Tenn. 2008). Even if the trial court has misapplied an enhancement or mitigating factor, the sentence will be upheld if "there are other reasons consistent with the purposes and principles of sentencing, as provided by statute . . . ." Bise, 380 S.W.3d at 706. On appeal, the burden is on the defendant to show that the sentence is improper. Tenn. Code Ann. § 40-35-401(d), Sentencing Comm'n Cmts.

The Sentencing Reform Act was enacted in order "to promote justice" by ensuring that every defendant "be punished by the imposition of a sentence justly deserved in relation to the seriousness of the offense." Tenn. Code Ann. § 40-35-102. In order to implement the purposes of the Sentencing Reform Act, trial courts must consider several sentencing

principles. The sentence imposed for an offense "should be no greater than that deserved for the offense committed" and "should be the least severe measure necessary to achieve the purposes for which the sentence is imposed." Tenn. Code Ann. § 40-35-103(2), (4). Sentences involving incarceration "should be based on the following considerations:"

> (A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;
>
> (B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or
>
> (C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

Tenn. Code Ann. §40-35-103(2). Trial courts should consider the "potential or lack of potential for the rehabilitation or treatment of the defendant" when "determining the sentence alternative or length of a term to be imposed." Tenn. Code Ann. §40-35-103(5).

In determining whether a defendant has previous history of criminal behavior, trial courts may consider unadjudicated criminal conduct. State v. Robinson, 971 S.W.2d 30, 46 (Tenn. Crim. App. 1997). Here, the trial court heard testimony that the Defendant had a long pattern of threatening behavior associated with his delusions, including shooting at a group of hunters when he lived in Florida. Additionally, the Defendant had no hesitation about committing a crime when the risk to human life was high. Contrary to the Defendant's argument, it was more than "mere speculation" that others were at risk. The Defendant shot the victim seven times while there were numerous people inside Jonny's. Additionally, the enhancement factor that the Defendant used a firearm during the commission of the offense is applicable here as use of a firearm is not an element of second degree murder. See State v. Raines, 882 S.W.2d 376, 385 (Tenn. Crim. App. 1994).

With respect to the Defendant's arguments regarding his proposed mitigating factors and the alleged excessiveness of his sentence, we note that, as stated above, a within range sentence imposed by the trial court will be upheld even if the trial court misapplied enhancement and mitigating factors so long as the trial court has not "wholly departed from" the Sentencing Reform Act and there are "other reasons consistent with the purposes and principles of sentencing" to support the sentence. Bise, 380 S.W.3d at 706. Here, the trial court properly used two enhancement factors to justify its sentence and a third undiscussed enhancement factor was also applicable. The applicable enhancement factors provided a sufficient basis for the trial court's decision in spite of the fact that the trial court declined

-23-

to apply the Defendant's proposed mitigating factors that had been established by the proof. As such, we conclude that the trial court did not abuse its discretion in sentencing the Defendant to twenty-three years.

## CONCLUSION

Upon consideration of the foregoing and the record as a whole, the judgment of the trial court is affirmed.

_____
D. KELLY THOMAS, JR., JUDGE