IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs April 9, 2014

# STATE OF TENNESSEE v. KEVIN R. BEASLEY

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2011-D-3614     Monte Watkins, Judge**

_____

**No. M2013-01424-CCA-R3-CD - Filed July 31, 2014**

_____

A Davidson County grand jury indicted the Defendant, Kevin R. Beasley, for attempted first degree premeditated murder. The trial court ordered that the Defendant undergo a forensic evaluation, after which it found the Defendant was competent to stand trial. The Defendant filed a motion to suppress his statement to police, which the trial court granted. The case was dismissed, and the State filed a notice of appeal. After a thorough review of the record and applicable authorities, we conclude that the trial court abused its discretion when it granted the Defendant's motion to suppress. As such, we reverse the trial court's judgment and remand this case for proceedings consistent with this opinion.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Reversed;**
**Case Remanded**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and JOHN EVERETT WILLIAMS, J., joined.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel Harmon, Senior Counsel; Victor S. Johnson, III, District Attorney General; Roger D. Moore, Assistant District Attorney General, for the appellant, State of Tennessee.

Jeffrey A. DeVasher, Assistant Public Defender (on appeal), and Aimee Soloway, Assistant Public Defender (at hearing), Nashville, Tennessee, for the appellee, Kevin R. Beasley.

**OPINION**
**I. Facts**

This case arises from an incident in which the Defendant allegedly attempted to run over the victim while driving a John Deere "Gator" utility vehicle on July 18, 2011. The

Defendant was arrested on the day of the offense, and the Davidson County grand jury indicted him for attempted first degree premeditated murder. The trial court subsequently ordered the Defendant to undergo a forensic evaluation.

## A. Competency Hearing

After the Defendant's forensic evaluation had been completed, the trial court held a hearing to determine whether the Defendant was competent to stand trial. During the hearing, Pamela Mary Auble, M.D., testified as an expert that she assessed the Defendant in September 2012. As part of her evaluation, she reviewed the Defendant's high school records, medical records, a psychological assessment, mental health records from September 2011 to January 2012, and jail records.

Dr. Auble agreed that the Defendant had an "extensive" mental health history. He suffered from schizophrenia, which had been present for many years. The Defendant had been admitted to psychiatric hospitals beginning in 2006. The Defendant's records indicated that the Defendant had intermittent treatment for "paranoi[a]" and "psychotic" behavior since 2006. The Defendant's records further indicated that he was not always cooperative during treatment. Dr. Auble stated that a Middle Tennessee Mental Health Institute ("MTMHI") psychiatrist had declared the Defendant incompetent in regard to this case. The Defendant was transferred to the hospital from the jail after his arrest in this case, and he attended "competency training groups" in November 2011, December, 2011 and January 2012. He was then determined to be competent, so the hospital returned him to the jail for further proceedings related to this case.

Dr. Auble said that the records from the competency training indicated that the Defendant did not participate in the competency group. He refused to read the materials, which might have been due in part to his "mental[] retarda[tion]." Dr. Auble testified that the notes from the groups indicated that the Defendant attended training groups in November 2011 but had a "big break" in December. She was unsure whether that indicated that no group was held or that she was not given the records. The notes from the January 2012 group indicated that the Defendant refused to participate, "staring bizarrely," and he was "anxious to leave." During the January 18, 2012 meeting, the Defendant was "quiet." The Defendant was determined to be competent on January 23, 2012, and returned to jail.

Dr. Auble said that the Defendant was also facing charges of stabbing a female victim in the neck. In relation to this case, "Dr. Brown" examined him on March 22, 2012, and she learned that he was not taking his prescribed medication. Dr. Brown expressed concern about the Defendant's mental state, and she found his thinking "illogical." Dr. Auble testified that Dr. Brown's notes indicated that she felt the Defendant might be responding to

2

hallucinations, that his concentration was poor, and that he was distractable.  Dr. Brown referred the Defendant again to MTMHI for an inpatient evaluation.

The Defendant was evaluated again from April 2 to April 26, 2012.  Dr. Auble said she did not have any notes from the Defendant's competency group during this time period. Dr. Auble testified that she felt that all the Defendant's treating physicians agreed that the Defendant was "seriously mentally ill."  Dr. Auble said that she had met with the Defendant the day before the competency hearing, and the Defendant maintained that he was hearing voices.  He told her that he had not heard any voices that day but that he had heard them several days before.  The Defendant had previously told her on multiple occasions that "white people . . . were raping him."

Dr. Auble testified that the Defendant's full scale IQ was 67.  He had been tested on two previous occasions, and his IQ was 71 and 60, respectively.  The Defendant's ability to read and write was at the first percentile for his age, indicating a reading level consistent with the third or fourth grade.  Further testing showed that the Defendant had "severe" deficits in his adaptive functioning.  Dr. Auble said that the Defendant had difficulty thinking logically and coherently, which prevented him from acting and thinking rationally in "complex situations."

Dr. Auble agreed that the Defendant had a basic understanding of courtroom rules. She said that, although he was "a little variable" and had "some difficulty," she believed he had the "essence" of what a judge was.  She said he had a limited capacity for reasoning, which would make it difficult for him to help his attorney in a meaningful way.

Dr. Auble described a conversation with the Defendant about a drug called "Cadeidra."  He told her:

> It's like the spirits.  It transfers other spirits, like the spirits are sending transfers to other people. . . .  The spirits are talking to other people.  They're like in two different bodies. . . .  Yes, Cadeidra is the drug.  The spirits – it's the spirits for the drug or the drug for the spirits.  They make the spirits get in your body.

The Defendant told her that the spirits were in his body and that they were "messing" with him.  He said "they" were "keeping it from my momma."  The Defendant said the spirits "cuss [him] out" and were the "voices that [he] hear[s]."  The Defendant said that he had been given Cadeidra for years and that "[t]hey" transferred waves to his body to let him know he was taking it.  Dr. Auble opined that the Defendant had limited capacity for rational thinking.

3

Dr. Auble testified that, when she interviewed the Defendant in September 2012, he was taking his prescribed medication and his psychosis was "controlled." He was not "acutely psychotic" at that time. She said that his reasoning was still "strange," but he was not actively psychotic and disorganized in a manner similar to the way he acted when she interviewed him the day before the competency hearing.

During cross-examination, Dr. Auble testified that the Defendant understood what he had been charged with in two separate pending cases. In the first case, he was accused of running over a man with a four wheel Gator and in the second case he was accused of stabbing a woman in the neck with a knife. Dr. Auble agreed that the Defendant was not incompetent based solely on his IQ. Dr. Auble said that the Defendant knew that he had been accused of a crime. She said, however, he did not understand the concept of a "plea bargain" or necessarily the circumstances he was facing. She recounted the following conversation between the two:

> I said, "What is a plea bargain?"
>
> He says, "It's when you plead guilty and you get a lesser sentence," which is accurate.
>
> I said, "Is that something you've ever thought about doing?"
>
> He said, "I already done it in one case."
>
> I said, "What case?"
>
> He said, "Stabbing the lady. The first one I'm still going to court for."
>
> I said, "The stabbing the lady?"
>
> He said, "That's what I'm going to court for on March 1st."
>
> I said, "What?"
>
> He said, "That's for trial."

Dr. Auble testified that, at the time of the hearing, the Defendant was compliant with taking his medication.

During redirect examination, Dr. Auble testified that the medications used to treat

4

schizophrenia were effective to alleviate hallucinations and delusions but that these medications do not "really touch" the negative effect of schizophrenia, including lack of motivation, "flat affect," and withdrawal.

Dr. Joe Mount, a psychologist, testified as an expert in the field of forensic psychology. He stated that he worked for MTMHI and that, during the course of his employment, he had conducted between 800 and 1,000 competency evaluations. Dr. Mount testified that he obtained the Defendant's records before contacting the Defendant for inpatient evaluation. The Defendant's records indicated that he was first admitted to MTMHI on September 13, 2011, and he remained there until October 10, 2011. He was evaluated by Dr. Farooq and Dr. Nemery in relation to his charge of attempted criminal homicide. The Defendant returned to the facility on November 3, 2011, being committed based upon his incompetency. The Defendant was not released from MTMHI until January 23, 2012, at which time he was discharged back to the jail as competent to stand trial.

Dr. Mount testified that the Defendant was again admitted to MTMHI on April 2, 2012, based on a second charge of attempted murder. Dr. Mount said that, when the Defendant was admitted to MTMHI, he was prescribed anti-psychotic medications. The Defendant did "fairly well" on the unit. He was involved in one assault against another patient. The Defendant improved "significantly" over the period of time that he was being treated. The Defendant remained at MTMHI until April 24, 2012, at which time doctors determined that he no longer met the commitment standards and was competent to stand trial.

Dr. Mount testified that the Defendant had a long mental health history. He had been hospitalized intermittently since his early teens. The Defendant had been admitted to Vanderbilt Hospital and "Tennessee Christian" on several occasions. He had been admitted to MTMHI on at least three occasions. The Defendant had "typically been diagnosed as having schizophrenia." He had a history of limited functioning and had been diagnosed as "border line intellectual functioning" or "mild[ly] mental[ly] retarded."

Dr. Mount testified that, in addition to medicating the Defendant, they attempted to improve his competency by increasing his understanding of how the court process works. They attempted to explain the charges he faced, how the court operates, and "what the players in the court do." Dr. Mount said he had seen the Defendant the Tuesday before the hearing and found him "in pretty good shape." He said he was very cooperative, made eye contact, and listened to the doctor. The Defendant told the doctor that the previous day had been Martin Luther King Day and that President Obama "got another four years," both of which were accurate.

Dr. Mount said that there were periods of time in the Defendant's history where he

had "borderline intellectual functioning." The Defendant, he said, did not understand "large" words, but he was able to communicate if one "kept it on a level that he is." Dr. Mount did not think that it would be difficult for the Defendant's attorneys to communicate with the Defendant if they were willing to do so.

With regard to his competency, Dr. Mount testified that he had asked the Defendant a series of questions the Tuesday before the hearing. The Defendant informed him that he was facing "major" charges. When asked if they were felony charges, the Defendant said, "Yes, it is." The Defendant advised the doctor of the possible sentences he faced and where he might have to serve his sentence. He expressed his understanding that his attorneys were there to help him and that the "other side" was there to prove that he was guilty. He understood that the judge was responsible for sentencing and that twelve men and women on the jury would decide if he was guilty. The Defendant said that he was the defendant because he was accused of committing the crime. The Defendant expressed some confusion about who would call him to testify. Other than that, the doctor felt he did a "pretty good job." Based upon his interview with the Defendant and review of the records, Dr. Mount opined the Defendant was competent to stand trial.

During cross-examination, Dr. Mount testified that he participated in the April 2012 evaluation of the Defendant. He said that, during the fall of 2011, the Defendant had been found incompetent. Dr. Mount agreed that the Defendant had a long history of psychosis and schizophrenia dating back to his early teen years. The doctor described the Defendant's mental intelligence as "somewhere between very high mild mental retardation . . . and borderline intellectual functioning." The doctor opined that the Defendant's mental abilities would make it difficult for him to think logically.

Dr. Mount agreed that during the April 2012 interview, the Defendant smiled inappropriately, his thought processes were disorganized, and he was, at times, preoccupied with racial issues. Dr. Mount said that, after a period of treatment on psychotropic medications, the Defendant had improved. At the time of his discharge, his doctors determined that he was competent to stand trial. Dr. Mount said that the Defendant's medication was a "strong component" of the Defendant's mental stability.

Dr. Mount agreed that the medication for schizophrenia only affected the "positive symptoms" of schizophrenia but did not affect the negative symptoms associated with schizophrenia such as withdrawal, flat affect, lack of motivation, and lack of desire to communicate. He agreed that these negative symptoms could affect a defendant's ability to communicate with counsel, but Dr. Mount said that the Defendant was doing "much better than [he] expected" when he interviewed the Defendant before the hearing. The Defendant told Dr. Mount that he had heard voices recently but that he just tried to ignore them. The

6

doctor said that the Defendant would not be a "good candidate" to provide testimony on his own behalf.

Based upon this evidence, the trial court determined that, although the Defendant had some "limitations," he was competent to stand trial.

## B. Motion to Suppress

The Defendant filed a motion to suppress his statement to police given on July 18, 2011. During the hearing on the motion to suppress, the parties presented the following evidence: Brian Brown, a Metropolitan Nashville Police Department sergeant, testified that, on July 18, 2011, he responded to an incident involving the Defendant. Dispatch informed him that an individual driving a John Deere Gator had run over another individual in East Park. When the sergeant arrived at the scene, a little before lunch, the victim was being transported, the Gator was sitting in a nearby field, and the Defendant was in custody and seated in a police car.

Sergeant Brown testified that he spoke with officers at the scene, who told him that they had been present when the Defendant had run over the victim. The sergeant then approached the car in which the Defendant was sitting, handcuffed, and opened the back door. The sergeant noted that the Defendant "wasn't going crazy" and that he "wasn't doing anything that stuck out" to the officer. The officer said that he provided the Defendant his *Miranda* warnings and that the Defendant appeared to understand what the sergeant had said. The Defendant indicated his willingness to speak with the officer. As the two were talking, the Defendant answered questions appropriately, and the Defendant admitted that he had run over the victim with the Gator. Sergeant Brown asked the Defendant if he was trying to kill the victim, and the Defendant admitted as much. Sergeant Brown said that there was no relationship between the Defendant and the victim and that the act was "random." Sergeant Brown said that the entire exchange between he and the Defendant was recorded, and the State offered the recording as evidence.

On the recording, Sergeant Brown can be heard asking the Defendant if he ran over the victim. The Defendant said, "Yes," and the Sergeant asked him if was trying to kill the victim. The Defendant again answered, "Yes." The Defendant denied any acquaintance with the victim. The Defendant told Sergeant Brown that he was trying to kill the victim because he just gets "angry." Sergeant Brown asked the Defendant if he was taking any medication, and the Defendant responded that he was a "mental health patient." The sergeant continued to question the Defendant and asked him if he knew that the police were trying to stop him. The Defendant responded that he did. Sergeant Brown asked the Defendant where he got the Gator, and the Defendant informed the officer that he had stolen the vehicle and

7

described from where he had stolen it. The Defendant told the officer that he ran over the victim twice with an aim to kill him.

Sergeant Brown said that, after he spoke with the Defendant, the Defendant was taken to the East Precinct. There, the Defendant was again advised of his *Miranda* warnings and he was again interviewed. A video recording of that interview was offered into evidence.

At the beginning of that interview, Sergeant Brown asked the Defendant if his last name was "Beasley." Sergeant Brown then asked whether the Defendant spelled his name with an "s" or a "z." The Defendant responded that he spelled it with an "s" but told the officer that he "can spell it any way though." The sergeant read the Defendant his rights and asked if he understood those rights. The Defendant responded affirmatively, and he signed the waiver.

The Defendant told Sergeant Brown that he had completed the 9th grade in school. He said that he did not use drugs other than marijuana. The Defendant told Sergeant Brown that he stole the Gator at around 4:00 or 5:00 a.m. He said that he knew that the Gator was there because he was "walking around" looking for a place to "rest [his] head." Sergeant Brown asked the Defendant how long he had been homeless, and the Defendant said that he had been homeless off and on because he believed that his family "conceded" him.

The Defendant said that he also stole gas from a truck located in the same area, but he took the gas five hours after stealing the Gator. The Defendant agreed with the sergeant that he traveled in the Gator to another part of town and that officers began chasing him. Sergeant Brown asked the Defendant why he chose the victim and again asked if he knew the victim. The Defendant said he did not know the victim but he just "started getting angry." He said he was angry at "life" because "life wasn't going good for [him]." The Defendant said he was trying to kill the victim. When Sergeant Brown asked the Defendant "why," the Defendant responded that he "got [his] family concede him and he [had] nowhere to go."

Sergeant Brown then asked the Defendant about another incident involving another victim. The Defendant agreed that he stabbed a woman in a grocery store parking lot. He said that he was "just angry," and he thought that "people were messing with [him]." He said that the woman was walking with a baby at the time and did not say anything to him. He said that he just "picked" her. The Defendant said he would "pick" anyone, "any color." He said he stabbed her in the neck. The Defendant said he had "anger management problems" and that he was "hearing voices and stuff." The Defendant said he believed he should receive "strict probation" for his offenses. He said he "don't bother nobody" but that "[I] just [had] mental health problems." He said he was not a "killer" but that he was tired of being messed

8

with. He said he was trying to let people know that he was not "playing" and that they should not "play" when he said to "stop messing with [him]."

The Defendant showed the sergeant the path that he took approaching the woman. He described the surrounding area, including street names. He described establishments located in the vicinity, and he told Sergeant Brown the path that he took after stabbing the victim.

When Sergeant Brown left the room, the Defendant continued to be recorded. He can be heard having a lengthy conversation when there was no one else in the room. He looked in the direction of an empty chair and paused intermittently during the "conversation."

When Sergeant Brown returned, he questioned the Defendant further about the stabbing. The Defendant recalled that the victim was wearing a white shirt, that he stabbed her from behind, and that he ran to his mother's house after the stabbing, describing his path of travel. The Defendant said he obtained the knife from his mother's home and that he left the knife at the crime scene.

Sergeant Brown asked the Defendant about the doctor who treated him, and the Defendant responded that he saw "Darcy" but that he did not recall her last name. The Defendant said he had been diagnosed as having schizophrenia and bipolar disorder. After questioning the Defendant a few more times about the stabbing incident, Sergeant Brown concluded the interview.

During cross-examination, Sergeant Brown testified he recalled that the Defendant's mental status was discussed at the scene, but he did not recall by whom or when that subject was addressed. The sergeant agreed that the Defendant did make odd statements at the scene.

Kimberly Brown, M.D., testified that the Defendant was court-ordered to undergo a forensic mental health evaluation to determine competency to stand trial and to assess his mental state at the time of the alleged offenses, which occurred on two separate dates. Dr. Brown testified that she met with the Defendant on three occasions: August 10, 2011, August 24, 2011, and March 22, 2012. Dr. Brown recalled that, during her first meeting with the Defendant, he "held it together and was fairly organized and logical," but toward the end of the meeting he "started to unravel and become more illogical and disorganized." Dr. Brown said that the Defendant was "[i]ntermittently compliant with his medication in jail," so she wanted to interview him at a later date.

Dr. Brown testified that she received and reviewed the Defendant's records, from which she gleaned that he had been "fairly consistently" diagnosed with schizophrenia

beginning in his mid-teens. The Defendant had, on three occasions, been hospitalized in a psychiatric institution. Two of these hospitalizations were during his teenage years, and the other was in 2006. The Defendant had been receiving "injectable medication" because he had a consistent history of not being compliant with taking his medication.

Dr. Brown said that the records indicated that, in the summer of 2001, the Defendant was becoming increasingly non-compliant with his medication, was using drugs, and was becoming more aggressive. The Mental Health Coop, which was monitoring his case, made several attempts to locate him, but they were unable to do so.

Dr. Brown reviewed a copy of the evaluation done by Dr. Morey on July 19, 2011, the day after the Defendant's arrest. She said that the records indicated that the Defendant was "psychotic; that . . . his thoughts were disorganized," meaning that they were "loose, not making much coherent sense." The Defendant was reported to have poor concentration, he was distracted, and he told the doctor that he was hearing voices on a daily basis. Medication was prescribed to the Defendant at that time.

Dr. Brown said that, judging from Dr. Morey's notes, the Defendant was doing "a little bit better" by the time that she interviewed him on August 10. Dr. Brown noted that the Defendant was "unusual" in that he made an effort to appear more normal when people were present. When he thought people were not watching him, he appeared more disorganized and more impaired. She said that her observation of this was confirmed by jail personnel, who had noted a similar finding. Dr. Brown explained that, in jail, the Defendant was monitored most of the time. Jail personnel noted that the Defendant made motions like he was wrestling someone in the cell. When jail personnel asked him what he was doing, he would respond that he was "exercising."

Dr. Brown said that, during the August 10 interview, she was accompanied by another evaluator, Dr. Kevin Welling. Dr. Brown said that she left the room, and Dr. Welling informed her that, when she was absent, the Defendant became more disorganized, starting to make illogical, incoherent sentences, rhyming words illogically, and deteriorating mentally. Dr. Brown said that, when she was present, the Defendant was "cooperative" despite the fact that it appeared hard for him to find the words to answer her questions.

Dr. Brown recalled that, during the interview, the Defendant talked about the television sending him messages. He said that his family "concedes" that "they" want to "steal his seed to reproduce." Dr. Brown recalled that the Defendant had previously alleged that people were trying to steal his "seed."

The Defendant also expressed anger with the police. The Defendant had

10

"longstanding beliefs, going back to his teenage years, that other people [we]re sexually assaulting him in his sleep." The Defendant alleged that the police were some of the people raping him. The Defendant had reported this to multiple care givers over an extended period of time. The Defendant talked about sending a "message" because he was tired of other people messing with him. He said that, when the police were chasing him in this case, he saw someone and thought that it would be a way to "send them a message" that he was "not a person to be reckoned with" and that they needed to leave him alone.

Dr. Brown testified that she reviewed with the Defendant the courtroom process. She then asked him if he understood the role of the judge, the jury, and his lawyer. The Defendant's answers showed he was limited in understanding.

Dr. Brown opined that, on the day of the Defendant's arrest, he was actively psychotic.

During cross-examination, Dr. Brown testified that she had not listened to the audio recorded statement given by the Defendant at the crime scene. She said she had also not watched the videotaped statement that he gave to the police. Dr. Brown said that, during the August 10 interview, the Defendant appeared to listen to what she had to say. The Defendant retained some of her explanation of who she was and why she was there. There was other information that she gave him that he forgot.

Dr. Brown testified that the Defendant was not malingering. Further, she said that he was "quite the opposite," in that he was somewhat guarded and attempting to conceal his symptoms.

Based upon this evidence, the trial court granted the Defendant's motion to suppress. It is from this judgment that the State now appeals.

## II. Analysis

On appeal, the State contends that the trial court erred when it granted the Defendant's motion to suppress. The State asserts that the proof does not establish that the Defendant lacked the mental capacity to knowingly and voluntarily waive his constitutional right to remain silent. The State notes that none of the experts testified that they had listened to the audio recording of the on-scene interview or watched the recorded interview, making the record devoid of any proof that the Defendant was psychotic at the time of his interview or was unable to understand the *Miranda* warnings. The State finally asserts that there was no evidence that the police overreached when questioning the Defendant.

11

The Defendant contends first that this Court does not have jurisdiction to hear the State's appeal pursuant to Tennessee Rule of Appellate Procedure 3(c) because the State has not shown that the trial court's grant of the motion to suppress resulted in the State being unable to proceed to trial. The Defendant further contends that the trial court properly granted his motion to suppress.

When it granted the Defendant's motion to suppress, the trial court made the following findings:

The primary issue is whether statements made by the [D]efendant on July 18, 2011 are the result of coercion by the officer without *Miranda* while the [D]efendant was under medication. . . .

. . . .

In case 2011-D-3614, it is alleged that the [D]efendant stabbed Catherine Fleming in the neck on June 3, 2011 and walked away. In case 2012-B-1503, it is alleged that the [D]efendant stole a John Deere "Gator" utility vehicle and drove the vehicle over Arvid Todd twice before being apprehended by police. At the scene, the [D]efendant was Mirandized by Metro Nashville Police Officer Brian Brown and interviewed. During the interview, the [D]efendant reported to Officer Brown that he was a mental patient and that he was hearing voices. The [D]efendant also admitted to stealing the vehicle. He indicated that he stabbed Ms. Fleming and ran over Mr. Todd because he was hearing voices and people were messing with him. He stated that he committed those acts to "send a message" to people who were mess[ing] with him.

Additionally, the [D]efendant showed symptoms of mental illness during an evaluation conducted on July 19, 2011, the day after his arrest. The [D]efendant has a history of mental illness. He has been diagnosed with schizophrenia as well as mental retardation. His IQ was last tested in the range of 67. The [D]efendant has been evaluated by Dr. Kimberly Brown, MTMHI as well as Dr. Pam Auble, a clinical neuropsychologist.

The [D]efendant contends that the statements made during his interrogations should be suppressed because those statements were made during the continuing psychotic episode. He asserts that he was incapable of knowingly and intelligently waiving his *Miranda* rights.

12

. . . .

The Court heard arguments of respective counsel, listened to the testimony and reviewed the record and relevant case law. Applying the above legal standard, the Court finds after review of the challenged statement under the totality of the circumstances that the [D]efendant was incapable of knowingly and intelligently waiving his *Miranda* rights. The [D]efendant lacked the mental capacity to waive his constitutional right to remain silent and voluntarily & knowingly give the police a statement.

Based on the totality of the circumstances, which include the [D]efendant's responses to the officer's questions that he was hearing voices and that he had a mental illness, the Court finds that the statements were made without an appreciation for waiving his rights. The [D]efendant's mental illness affected "his capacity in the first place to form a will of his own and to reject the will of others." *State v. Turner* 1999 WL 817690 citing *State v. Benton*, 759 S.W.2d 427, 43 (Tenn. Crim. App. 1988); *State v. Blackstock*, 19 S.W.3d 200, 207 (Tenn. 2000). Further, the Court finds that the [D]efendant's display of incompetence during the interrogation warrants that further questioning by the police constituted overreaching. *Turner* citing *Benton* at 432.

Therefore, the Court finds that the [D]efendant's statements are not admissible. The [D]efendant's motion to suppress is GRANTED.

## Tennessee Rule of Appellate Procedure 3(c)

The Defendant asserts that the State should have sought appellate review pursuant to Tennessee Rule of Appellate Procedure 9, interlocutory appeal, or Rule 10, extraordinary appeal. He notes that more than two months after the trial court granted the Defendant's motion to suppress, the trial court entered an order dismissing this case and stating that "[t]he State has advised that it cannot proceed with prosecution of the defendant as a result of the Court's ruling." The Defendant asks this Court to dismiss the appeal. The State responds that this Court has jurisdiction because the trial court entered an order of dismissal and that it filed a timely notice of appeal.

Tennessee Rule of Appellate Procedure 3(c)(1) states:

In criminal actions an appeal as of right by the state lies only from an order or judgment entered by a trial court from which an appeal lies to the

Supreme Court or Court of Criminal Appeals: (1) the substantive effect of which results in dismissing an indictment, information, or complaint; (2) setting aside a verdict of guilty and entering a judgment of acquittal; (3) arresting judgment; (4) granting or refusing to revoke probation; or (5) remanding a child to the juvenile court. The state may also appeal as of right from a final judgment in a habeas corpus, extraction, or post-conviction proceeding, from an order or judgment entered pursuant to Rule 36 or Rule 36.1, Tennessee Rules of Criminal Procedure, and from a final order on a request for expunction.

We find instructive to this case the facts of *State v. Phillips*, 30 S.W.3d 372 (Tenn. Crim. App. 2000), in which this Court stated:

This case has followed a very unique procedural trail. After the trial court ordered that the pretrial statement of the defendant be suppressed, the state properly and timely sought from the trial court an interlocutory appeal pursuant to Tenn. R. App. P. 9. At the hearing, the prosecutor indicated the state could seek either a Tenn. R. App. P. 9 interlocutory appeal or a Tenn. R. App. P. 3 appeal as of right. The prosecutor requested a Tenn. R. App. P. 9 interlocutory appeal since this would "speed it along." Upon being reminded by the trial court that a Tenn. R. App. P. 3 appeal is only available when the ruling is "tantamount to dismissal," the prosecutor responded, "We can't prosecute this case without the statement." Thereafter, the trial court denied the Tenn. R. App. P. 9 interlocutory appeal; the state did not seek a Tenn. R. App. P. 10 extraordinary appeal; and the state filed a Tenn. R. App. P. 3 appeal as of right stating in its notice that the suppression of the pretrial statement "is the equivalent of dismissing the case."

By seeking a Tenn. R. App. P. 9 interlocutory appeal from the trial court, the state did that which should be done if the state desires relief from an order suppressing a confession. If a trial court denies a Tenn. R. App. P. 9 application relating to the suppression of a confession, the state should ordinarily consider a Tenn. R. App. P. 10 extraordinary appeal if proper grounds exist. In most instances the suppression of a defendant's pretrial statement would not preclude further prosecution and would not have the substantive effect of the dismissal of an indictment. Although the grounds for granting a Tenn. R. App. P. 10 extraordinary appeal are limited, a Tenn. R. App. P. 3 appeal by the state seeking relief from suppression of a confession can only be sought where the substantive effect of the ruling results in a dismissal of the indictment. Since the state can ordinarily proceed with

14

prosecution despite the suppression, the state should not seek a Tenn. R. App. P. 3 appeal in such situations. FN1

> FN1. If the suppression order relates to the suppression of seized drugs, the state ordinarily and properly files a Tenn. R. App. P. 3 appeal as of right. *See, e.g., State v. Lee*, 836 S.W.2d 126 (Tenn. Crim. App. 1991). In such a case the state is truly unable to prosecute without the admission of the contraband.

In the case at bar, the state has expressly represented to the trial court and this court that it cannot prosecute without the defendant's pretrial statement. FN2 Based upon this representation, we entertain this Tenn. R. App. P. 3 appeal as of right.

> FN2. The record is inconclusive as to why the state cannot proceed with prosecution absent the defendant's pretrial statement. However, the State's motion for Tenn. R. App. P. 9 interlocutory appeal avers that "without defendant's admissions, the state will not be able to carry its burden of proof at trial. The child victim is very young, resides in a family situation that is non-supportive and will be easily confused and impeached at trial if she is even capable of testifying. There are no other witnesses to the offenses." The decision not to prosecute without the defendant's pretrial statement to the investigators was within the District Attorney's discretion.

*Phillips*, 30 S.W.3d at 373-74.

In the case presently before us, like in *Phillips*, the State informed the trial court that it could not proceed to trial without the Defendant's confession. As in *Phillips*, the State's reasoning is not entirely clear. This case presented a difficult situation for the State in that it clearly could not prove the stabbing case against the victim in the other related case without the Defendant's confession in this case. In the stabbing, there were no witnesses, and the victim never saw the Defendant, who attacked her from behind while she was pushing a stroller. While the record is not clear whether there may have been other evidence with which the State could have proceeded to prosecute the Defendant for running over the victim with the Gator utility vehicle, it was in the State's best interest to appeal the grant of the motion to suppress, which affected both cases. Based upon this set of facts, we entertain this Tennessee Rule of Appellate Procedure 3 appeal as of right.

15

## B. Motion to Suppress

As previously stated, the State asserts that the proof does not establish that the Defendant lacked the mental capacity to knowingly and voluntarily waive his constitutional right to remain silent. The State notes that none of the experts testified that they had listened to the audio recording of the on-scene interview or watched the recorded interview, making the record devoid of any proof that the Defendant was psychotic at the time of his interview or was unable to understand the *Miranda* warnings. The State finally asserts that there was no evidence that the police overreached when questioning the Defendant. The Defendant counters that the evidence supports the trial court's grant of his motion to suppress.

A trial court's factual findings on a motion to suppress are conclusive on appeal unless the evidence preponderates against them. *State v. Binette*, 33 S.W.3d 215, 217 (Tenn. 2000); *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). Thus, questions of credibility, the weight and value of the evidence, and the resolution of conflicting evidence are matters entrusted to the trial judge, and this court must uphold a trial court's findings of fact unless the evidence in the record preponderates against them. *Odom*, 928 S.W.2d at 23; *see also* Tenn. R. App. P. 13(d). The application of the law to the facts, however, is reviewed de novo on appeal. *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998). We review the issue in the present appeal with these standards in mind.

The Fifth and Fourteenth Amendments to the United States Constitution and article I, section 9 of the Tennessee Constitution protect an accused's privilege against self-incrimination. Moreover, in *Miranda v. Arizona*, 384 U.S. 436, 478-479 (1966), the United States Supreme Court held that the Fifth and Fourteenth Amendments' prohibition against compelled self-incrimination requires police officers, before initiating custodial interrogation, to advise the accused of his right to remain silent and his right to counsel. Assuming the use of these procedural safeguards by police interrogators and provided that the accused is acting voluntarily, knowingly, and intelligently, an accused may waive his *Miranda* rights. *State v. Mann*, 959 S.W.2d 503, 529 (Tenn. 1997).

The Defendant in this case does not allege that the police failed to comply with the procedural requirements of *Miranda*. He does allege that, at the time of his confession, "his mental illness, active psychosis, and intellectual disability rendered him unable to knowingly and intelligently waive his *Miranda* rights."

In *State v. Stephenson*, 878 S.W.2d 530, 544-545 (Tenn. 1994), our Supreme Court defined a voluntary and knowing waiver of *Miranda* rights:

Relinquishment of the right must be voluntary in the sense that it is the product

of a free and deliberate choice rather than the product of intimidation, coercion or deception. Moreover, the waiver must be made with full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon. The "totality of the circumstances surrounding the interrogation" must reveal both an uncoerced choice and the required level of comprehension before a court can properly conclude that *Miranda* rights have been waived.

Tennessee courts have previously addressed the effect of an accused's insanity upon both the knowing and intelligent nature and the voluntary nature of a *Miranda* waiver. Generally, Tennessee courts have held that mental illness will not alone render a confession invalid. *State v. Bell*, 690 S.W.2d 879, 882 (Tenn. Crim. App. 1985); *State v. Green*, 613 S.W.2d 229, 233 (Tenn. Crim. App. 1980); *see also State v. Perry*, 13 S.W.3d 724 (Tenn. Crim. App. 1999) (holding that a deaf, but literate and of average intelligence, paranoid schizophrenic defendant who had the ability to read lips, whose chronic use of glue may have impaired his cognitive abilities, and who was administered *Miranda* warnings without the benefit of a sign language interpreter, voluntarily and knowingly waived his *Miranda* rights). Rather, the evidence must otherwise demonstrate that the accused was incapable of understanding his rights or that the mental illness affected "his capacity in the first place to form a will of his own and to reject the will of others." *State v. Benton*, 759 S.W.2d 427, 431 (Tenn. Crim. App. 1988).

In *Colorado v. Connelly*, 479 U.S. 157, 169-170 (1986), the United States Supreme Court diminished the relevance of an accused's mental state in assessing the voluntariness of a *Miranda* waiver. The Court held that police coercion is a prerequisite to a finding that an accused did not voluntarily waive his *Miranda* rights. *Id.* at 170. The Court remarked, "[t]he voluntariness of a [Miranda] waiver . . . has always depended on the absence of police overreaching, not on 'free choice' in any broader sense of the word." *Id.* at 170. Of course, our Supreme Court has observed that a defendant's right under article I, section 9 of the Tennessee Constitution is broader and more protective of individual rights than the test for voluntariness under the Fifth and Fourteenth Amendments to the United States Constitution. *State v. Crump*, 834 S.W.2d 265, 268 (Tenn. 1992). Nevertheless, our Supreme Court has not only cited *Connelly* with approval, *State v. Brimmer*, 876 S.W.2d 75, 79 (Tenn. 1994), but has appeared to expand the *Connelly* prerequisite of coercive police activity to inquiries into the knowing and intelligent nature of a waiver. *State v. Bush*, 942 S.W.2d, 489, 500-501 (Tenn. 1997); *see generally State v. Billy Joe Henderson*, No. 03C01-9804-CR-00139, 1999 WL 398087, at *11-13 (Tenn. Crim. App., at Knoxville, June 18, 1999), *perm. app. denied* (Tenn. Nov. 22, 1999).

In *Bush*, 942 S.W.2d at 500, the defendant asserted that the trial court should have suppressed his statements to the police because he was not competent to make a knowing and

17

intelligent waiver of his *Miranda* rights. In declining to afford relief, our Supreme Court noted that there was no proof of police overreaching, as the defendant "appeared normal [during the interrogation], was coherent and responsive to questioning, and did not discuss demons, vampires, or other delusions." *Id.* at 501. In other words, the relevant question was not whether the defendant was incompetent in fact but whether he displayed such incompetence that further questioning by the police constituted "overreaching." *Cf. Benton*, 759 S.W.2d at 431-32 (in the case of a forty-three-year old defendant whose mind functioned at the intellectual level of a five-year-old, the actions by the police of merely taking the defendant into police custody and questioning him provided the "coercion" required by *Connelly*).

In *State v. Clayton Eugene Turner*, No. 03C01-9805-CR-00176, 1999 WL 817690, at *6-7 (Tenn. Crim. App., at Knoxville, Oct. 6, 1999), *perm. app. denied* (Tenn. Apr. 24, 2000), the defendant referenced past delusions during his police interrogation. This Court held that his references to past delusions, in the absence of any indications of incompetence at the time of his statement, were insufficient to transform the interrogating officers' conduct into police overreaching. It further held that, even assuming that the *Connelly* requirement of police coercion did not apply to inquiries into the knowing and intelligent nature of a *Miranda* waiver, a preponderance of the record in that case supported the trial court's finding that the appellant/defendant was in fact competent to waive his *Miranda* rights. *Id.*

After having thoroughly reviewing the record before us, including the audio recording of the Defendant's statement at the crime scene and the video recording of his police interrogation, we conclude that the police, specifically Sergeant Brown, did not overreach as defined by our case law. At the crime scene, the Defendant clearly and simply stated what had happened. His candor seemingly surprised Sergeant Brown, who asked the Defendant if he was on medication. The Defendant responded he was a mental health patient, and he provided no further details.

During the interrogation at the police station, the Defendant clearly explained what happened. He recounted the timing of his stealing the Gator, the location of the theft, and then his subsequent activities stealing gas and running over the victim. The Defendant assisted Sergeant Brown in creating a map of the scene of the stabbing, offering street names and the names of local establishments. While it is true that later the Defendant seemingly had a "conversation" while no one was present in the room, Sergeant Brown was unaware of the Defendant's behavior. Sergeant Brown was aware that the Defendant had been diagnosed with bipolar and schizophrenia and that he acted "odd." According to the Defendant's expert, however, the Defendant attempted to hide and downplay his psychosis. In this instance, he did so effectively, and while he mentioned that he was a "mental health patient," he also acted otherwise appropriately for most of the duration of his interaction in

18

police presence. Further, the Defendant stated that he had completed the ninth grade, and he appeared competent during the interview, assisting Sergeant Brown in drawing a map of the crime scene. In our view, the trial court's finding that the Defendant's statements displayed such incompetence that further questioning by the police constituted "overreaching" is contrary to the evidence presented at the suppression hearing. *See Bush*, 942 S.W.2d at 501. Accordingly, we reverse the trial court's grant of the Defendant's motion to suppress.

### III. Conclusion

In accordance with the aforementioned reasoning and authorities, we reverse the trial court's judgment granting the Defendant's motion to suppress. We remand this case for further proceedings consistent with this opinion.

_____
ROBERT W. WEDEMEYER, JUDGE